In re Cecil Monroe MUSSER, II, Teresa Perdue Musser, Debtors.

COMMUNITY HOSPITAL OF ROANOKE VALLEY, INC., Plaintiff/Appellant,

v.

Cecil Monroe MUSSER, II, et al., Defendants/Appellees.

In re Romeo Calulot BAYLON, Debtor.

ROANOKE MEMORIAL HOSPITAL AS-SOCIATION, t/a Roanoke Memorial Hospitals, Plaintiff/Appellant,

v.

Romeo Calulot BAYLON

and

Michael J. Aheron, Esq., Trustee, Defendants/Appellees.

Bankruptcy Nos. 7–81–01090, 7–81–01252.
Civ. A. Nos. 82–0228, 82–0219.
Adv. Nos. 7–81–0422, 7–81–0502.

United States District Court,
W.D. Virginia,
Roanoke Division.

Nov. 15, 1982.

Frank N. Perkinson, Jr., Roanoke, Va., for Community Hosp.

Dudley F. Woody, Roanoke, Va., for Roanoke Mem. Hosp. Ass'n.

Michael J. Aheron, trustee, Roanoke, Va.

F. Jack Ward, Roanoke, Va., for Cecil and Teresa Musser.

Ross C. Hart, Roanoke, Va., for Baylon.

## MEMORANDUM OPINION

TURK, Chief District Judge.

Community Hospital of Roanoke Valley, Inc. ("Community Hospital") and Roanoke Memorial Hospital Association, t/a Roanoke Memorial Hospitals ("Roanoke Hospital"), appeal from Orders of the bankruptcy court, entered March 1, 1982, holding *inter alia,* that various assignments to the hospitals were ineffective. The court finds that the bankruptcy court erred in holding that the assignments were void *ab initio* under Virginia law. The Order entered in Adversary Proceeding No. 7–81–0422, 21 B.R. 446, is, accordingly, vacated and the case remanded for additional consideration. However, the Order entered in Adversary Proceeding No. 7–81–0502, 21 B.R. 54, is affirmed on the grounds that the assignments executed by Romeo Calulot Baylon were not valid assignments.

1. This form provided in pertinent part as follows:

 *Assignment of Insurance Benefits and Release of Information:*
 I hereby authorize payment directly to Community Hospital of Roanoke Valley, Roanoke, Virginia, of the hospital benefits otherwise

## FINDINGS OF FACT

*Community Hospital of Roanoke Valley, Inc. v. Musser*

Cecil Monroe Musser, II and his wife Teresa Perdue Musser were involved in a serious automobile accident on December 21, 1980. They were both admitted to Community Hospital for treatment of their injuries. The hospital learned that their injuries were due to an accident caused by John Stratton and that Stratton's liability carrier was Nationwide Insurance Company. The Mussers had no medical insurance.

A day or two after the accident, Mrs. Musser signed an "Assignment of Insurance Benefits and Release of Information" form [1] for herself and one on behalf of her husband. Mr. Musser signed the same form for himself on March 22, 1982.

Although Mrs. Musser was discharged from the hospital on February 21, 1981, she was re-admitted on May 4, 1981, due to complications from the accident, at which time Mr. Musser signed the same agreement for his wife and applied for free care under the Hill-Burton Act, 42 U.S.C. §§ 291 *et seq.* He told hospital personnel that he had no funds to pay for his wife's hospitalization and did not mention that he and his wife had pending personal injury claims against Stratton. The Hill-Burton application contained a pledge by the applicant (Mr. Musser) to seek assistance from other sources for payment of the hospital bill and to "assign, or pay, to the hospital" any amounts received from other sources.

The Mussers settled with Nationwide Insurance Company sometime during the period of Mrs. Musser's second hospitalization. They received a check for $22,000 for both their claims after the deduction of attorney's fees and costs. When they settled, Mrs. Musser knew that her husband had applied for free care under the Hill-Burton

payable to me, but not to exceed the hospital's regular charge for this period of hospitalization. I understand I am financially responsible to the hospital for charges not covered by this assignment.
In addition, the form provided that "[t]he guarantor ... waives homestead...."

Act. But even though Mrs. Musser remained in the hospital for about a week after they received the check, the Mussers did not inform the hospital of the settlement.

The balance of the Mussers' three accounts with Community Hospital totaled approximately $22,000. On advice of counsel, the Mussers did not pay the hospital for its services.

The Mussers filed a Chapter 7 joint petition in bankruptcy on September 4, 1981. They also filed a homestead deed in which some of the items claimed as exempt had been purchased with the proceeds of their personal injury recovery.

On October 30, 1981, Community Hospital filed an adversary proceeding to (1) determine the dischargeability of its debts under 11 U.S.C. § 523(a)(2); (2) interpret the written agreements signed by the Mussers; and (3) have the homestead deeds declared ineffective as to its debts because the Mussers had signed written waivers of homestead.

The bankruptcy court held a hearing on the complaint on January 11, 1982. On March 1, 1982, that court issued a Memorandum Opinion and Order holding that (1) the alleged assignments were void because a personal injury claim is a nonassignable interest, (2) the hospital's claimed waiver of homestead was unenforceable to the extent that the hospital's claim for amounts due was not a secured claim under Va.Code § 8.01–66.2 (1982 Cum.Supp.), and (3) the debt to the hospital was dischargeable.

Community Hospital filed a notice of appeal on March 9, 1982.

*Roanoke Hospital Association v. Baylon*

On April 25, 1981, Romeo Calulot Baylon was seriously injured when he was struck by an automobile. He was admitted to Roanoke Hospital for treatment.

On May 29, 1981, Baylon signed an "Assignment of Settlement" form [2] and on June 4, 1981, he signed an "Assignment of Insurance Benefits" form.[3] Baylon, a native of the Philippines who spoke English haltingly and had been in this country only two months before the accident, testified that he was told by the hospital's financial counselor that the first form merely authorized his medical bills to be mailed to his attorney, and that he believed this explanation. Baylon also testified that he did not remember signing the second form, although it was stipulated that he did sign the document. But the hospital's financial counselor testified that she had explained the purposes of the forms to him, and that he read and signed the forms without asking any questions. In addition, the financial counselor testified that she did not know that English was not Baylon's native language.

Baylon's personal injury claim was ultimately settled with an insurance carrier for $25,000. His total hospital bill is $24,965.48, all of which remains unpaid.

On October 13, 1981, Baylon filed a Chapter 7 petition in bankruptcy. On December 9, 1981, Roanoke Hospital filed an adversary proceeding to determine (1) the hospital's rights to the proceeds of the personal injury settlement entered into by Baylon prior to his bankruptcy, and (2) the validity of a homestead exemption filed by Baylon.

---

**2.** This form provided the following:

*Assignment of Settlement*

I hereby request and authorize Smeltzer, Hart & Palmer—attorneys to pay directly to ROANOKE MEMORIAL HOSPITALS any and all benefits due me for services rendered at Roanoke Memorial Hospitals. I will be responsible for any difference between my hospital expenses and the benefits derived from my settlement. I further agree that, should my illness be such that it is not covered by said settlement, I will pay to Roanoke Memorial Hospitals the value of all hospital expenses incurred by me.

**3.** This form provided the following:

*Assignment of Insurance Benefits*

I hereby request and authorize the (insurance co.) *Aetna Life & Casualty* to pay directly to ROANOKE MEMORIAL HOSPITALS any and all benefits due me under the terms of policy number and numbers _____. I will be responsible for any difference between my hospital expense and the benefits derived from my insurance policy or policies. I further agree that, should my illness be such that is not covered by said policy or policies, I will pay to Roanoke Memorial Hospitals the value of all hospital expenses incurred by me.

The bankruptcy court held a hearing on the complaint on January 4, 1982. On March 1, 1982, that court issued a Memorandum Opinion and Order holding that (1) the alleged assignment of the personal injury settlement was invalid because the document was executed by Baylon under a complete misunderstanding of the facts and because such assignments are invalid under Virginia law, and (2) the settlement funds remaining after payment of attorney fees and the homestead exemption constituted an asset of the bankruptcy estate since the assignment was avoided.

Roanoke Hospital filed a notice of appeal on March 3, 1982.

It being agreed by the parties that these bankruptcy appeals present an identical question of law, that is, whether the proceeds from a personal injury settlement are assignable under Virginia law, these two appeals were consolidated and oral arguments were heard on August 18, 1982. In addition, Community Hospital, Roanoke Hospital, Baylon and Michael J. Aheron, Esquire, (the Trustee in both of the bankruptcy cases), have submitted briefs in support of their respective positions. These appeals are now ready for disposition.

## CONCLUSIONS OF LAW

Both Community Hospital and Roanoke Hospital have appealed the bankruptcy court's decision that Virginia law prohibits assignments of the proceeds of a personal injury claim. In addition, Community Hospital appeals the bankruptcy court's rulings that the hospital's waiver of homestead was unenforceable and that the Mussers' debt to the hospital was dischargeable. The court will first address the issues raised only by Community Hospital before turning to the question shared by both of these appeals.

### *Waiver of Homestead*

■ The documents signed by the Mussers contained waivers of homestead and other exemptions. The debtors have nevertheless filed homestead deeds and the total value of both debtors' homestead exemptions is $9,500. The bankruptcy court held that the hospital's claimed waiver of exemptions was enforceable only to the extent of $500, the amount of the hospital's statutory lien under Va.Code § 8.01–66.2 (1982 Cum.Supp.). In so holding, the bankruptcy court reasoned that any waiver of exemptions properly allowed under 11 U.S.C. § 522(b) executed by a debtor in favor of an unsecured creditor is unenforceable pursuant to 11 U.S.C. § 522(e), and that because the hospital's claim for amounts due was secured only to the extent of its statutory lien amount, the hospital's waiver of homestead was unenforceable as to the remainder of its claim for accounts due.

Community Hospital argues that this decision should be reversed because the debtors did not properly itemize their exemptions in Schedule B4 of their petition. This court does not agree. As the bankruptcy court properly noted, the property scheduled in the homestead deeds could be exempted from the estate, despite the improper itemization, because their petition incorporated their homestead deeds by reference.

■ Community Hospital contends further that the Mussers' rights in the homestead property are inferior to the hospital's because the Mussers (1) waived their homestead exemptions, and (2) granted the hospital an equitable lien in the proceeds of their personal injury recovery, but instead of paying their hospital bills with those proceeds, purchased the property listed on their homestead deeds with those proceeds.

Nevertheless, the plain language of 11 U.S.C. § 522(e) makes clear that a debtor's waiver of exemptions in favor of an unsecured creditor is ineffective. This court therefore affirms the bankruptcy court's decision that the hospital's waiver of homestead is ineffective to the extent that its claim against the Mussers is an unsecured claim.

### *Dischargeability of Community Hospital's Claim Against the Mussers*

Community Hospital also sought to have the unsecured portion of its claim against the Mussers declared nondischargeable pur-

suant to 11 U.S.C. § 523(a)(2).[4] But the bankruptcy court denied this request on the grounds that § 523(a)(2)(A) did not bar discharge of the Mussers' hospital bill because there was no evidence that the debtors had made false or fraudulent representations to the hospital; and that § 523(a)(2)(B) did not bar discharge of the debt because the hospital had not established that it had relied on, or that the Mussers had intended to deceive by means of, the financial statement submitted as part of the Hill-Burton application.

 Community Hospital now argues for reversal of this decision of the bankruptcy court on the grounds that the Mussers obtained free hospital care by deliberately concealing a material fact from the hospital. Community Hospital supports this contention by pointing out that Mr. Musser did not mention the pending accident case, or his alleged assignment to the hospital of the proceeds thereof, when he applied for free care under the Hill-Burton Act. And the hospital further asserts that Mr. Musser's "perjury on the Hill-Burton application" was compounded by the Mussers' failure to disclose that they had received a personal injury settlement approximately a week before Mrs. Musser's second release from the hospital.

As the bankruptcy court correctly pointed out, § 523(a)(2)(B) would not bar discharge of this debt unless the creditor showed by clear, cogent and convincing evidence that the debtors had obtained services by use of a materially false, written financial statement on which the creditor relied and which the debtor caused to be made with intent to deceive. Applying this standard, the Mussers' debt to the hospital is not excepted from discharge under § 523(a)(2)(B). Mr.

Musser did not know that he and his wife would soon be receiving their settlement proceeds when he completed the Hill-Burton application on May 4, 1982. At that time, the Mussers had only a mere possibility that they might recover damages for their personal injuries. In short, the Mussers' contingent personal injury claims were not material facts on May 4, 1982. Thus, the failure to disclose the claims did not render the Hill-Burton application materially false. Likewise, no intent to deceive can reasonably be inferred from the failure to disclose the contingent claims, particularly since there was no question on the Hill-Burton application which asked about pending lawsuits.

Nor was the Mussers' debt made nondischargeable under § 523(a)(2)(A) by the Mussers' failure to disclose that they received a personal injury settlement approximately a week before Mrs. Musser's second release from the hospital. Although "silence or concealment as to a material fact can constitute a false pretense or a false representation as surely as an overt act," *In re Quintana,* 4 B.R. 508, 510 (Bkrtcy.S.D. Fla.1980), the debtor's failure to disclose must be the product of a fraudulant design. *In re Chambers,* 10 B.R. 92 (Bkrtcy.N.D.Ga. 1981). There is no evidence that the Mussers executed the assignment forms with the intention of not following through on their promises. It is true that the Mussers did not inform the hospital of the settlement of their suits. However, the record indicates that this failure to disclose was not the product of fraudulent design but rather that the Mussers acted on the advice of their attorney. Accordingly, the court concludes that the unsecured portion of the Mussers' hospital debt is not excepted from discharge under § 523(a)(2).

---

4. § 523 Exceptions to discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does, not discharge an individual debtor from any debt—
(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive; ....

*Assignment of Personal Injury Proceeds*

■ A "legal assignment" is a manifestation of intent by the owner of a present right to make a present transfer of the right by virtue of which the assignor's right to performance by the obligor is extinguished and the assignee acquires a right to such performance. *See* J. Calamari & J. Perillo, *The Law of Contracts* § 18–3 (2d ed. 1977) [hereinafter cited as *Contracts*]; Restatement (Second) of Contracts § 317 (1981). In other words, a legal assignment is a transfer of a present right which divests the assignor of all control over that which is assigned. Accordingly, "[a] contract . . . to transfer proceeds to be received in the future by the promisor . . . is not [a legal] assignment," Restatement (Second) of Contracts § 330 (1981), because there is no present transfer of a present right. *See Contracts, supra* at 633–34 and 659.

■ But while a transfer of something which does not yet exist is not a valid legal assignment, the doctrine of equity is different. An assignment for value of a future right, such as money to be acquired in the future, operates as an "equitable assignment." "[T]he theory [is] that although one may not effect a present transfer of what he does not have, equity will treat the purported assignment as a promise to assign, and will ordinarily order specific performance of the promise after the right comes into existence." *Contracts, supra* at 659. *See also* Restatement (Second) of Contracts § 330 comment c (1981). Consequently an equitable assignment does not pass legal title in the right assigned when such is subsequently acquired without some new act of the assignor. It instead vests an equitable ownership in the property in the equitable assignee as soon as the property is acquired by the equitable assignor. *Braxton v. Bell,* 92 Va. 229, 23 S.E. 289 (1895).

■ The documents signed by Baylon and the Mussers provided that the debtors would assign to the hospitals which provided them with medical care the proceeds of any settlement or insurance benefits resulting from their personal injury claims to the extent of the value of the medical care provided to them by the hospitals. But the debtors executed the assignment forms when their rights to recover settlements or insurance proceeds for their personal injuries were uncertain and contingent. They had only a possibility that they would receive personal injury damages in the future. Baylon and the Mussers had no present rights in their personal injury settlements which they subsequently received when they assigned those proceeds to the hospitals. Because the subjects of the assignments, (i.e., the possible settlement or insurance proceeds), were future property, the agreements executed by the debtors operated as equitable assignments rather than legal assignments. *See Richard v. National Transportation Co.,* 158 Misc. 324, 285 N.Y.S. 870 (1936). Having determined that the agreements in question operated as equitable assignments, the court now turns to the common issue raised by both of these appeals.

The question raised by both appellants is whether the rule of law which proscribes assignments of personal injury causes of action also prohibits a hospital from obtaining an assignment of the insurance or settlement proceeds of an individual's personal injury claim to the extent of the value of the services provided by the hospital in treatment of the individual's personal injuries.

The bankruptcy court held that the assignments of the debtors' personal injury proceeds were void *ab initio* under Virginia law. That court reasoned that such assignments were contrary to Virginia law because Va.Code § 8.01–26 (1977 Repl.Vol.) proscribes assignments of causes of action for personal injury. The bankruptcy court supported its decision by citing *City of Richmond v. Hanes,* 203 Va. 102, 122 S.E.2d 895 (1961) and *In re Musgrove,* 7 B.R. 892 (Bkrtcy.W.D.Va.1981). It also rejected Roanoke Hospital's contention that *Collins v. Blue Cross of Virginia,* 230 Va. 540, 193 S.E.2d 782 (1973), supports its claimed right to the assignments, stating that *Collins* involved contract subrogation rights which

are "quite different from an assignment of a tort claim in contravention of § 8.01–26." *Roanoke Memorial Hospital Association v. Romeo Calulot Baylon and Michael J. Aheron, Trustee,* Memorandum Opinion at 4 (March 1, 1982).

The appellees argue that the bankruptcy court's decision should be affirmed because personal injury causes of action are not assignable under Virginia law. They further contend that the distinction made by the appellants between an assignment of a cause of action itself and an assignment of the proceeds thereof is improper and contrary to Virginia law. Baylon claims that the Supreme Court of Virginia did not recognize this distinction when it decided *Hanes, supra.* And the trustee asserts that the public policy reason expressed in *Allstate Insurance Co. v. Druke,* 118 Ariz. 301, 576 P.2d 489 (1978), for proscribing assignments of personal injury claims, (to-wit: a victim of an accident should be compensated for all of his damages), also prohibits assignments of the proceeds thereof. The trustee argues that "by making such an assignment, a victim of an accident may not be fully compensated for his damages, although all the medical bills may be paid." Brief of Appellee Michael J. Aheron, Trustee, at 3.

The court, however, is not persuaded that the bankruptcy court properly interpreted the scope of Virginia's rule against assignments of personal injury causes of action. Although the court recognizes that Va.Code § 8.01–26 (1977 Repl.Vol.) [5] prohibits the assignment of a cause of action for personal injuries, there is a legally significant distinction between an assignment of a personal injury cause of action and an assignment of the settlement proceeds or insurance benefits thereof. *See Sperling v. McCarthy,* 142 F.Supp. 780 (S.D.N.Y.1956); *Block v. California Physicians Service,* 244 Cal. App.2d 266, 53 Cal.Rptr. 51 (1966); *Cassetta v. Del Frate,* 116 Cal.App. 255, 2 P.2d 533 (1968); *Richard v. National Transportation Co.,* 158 Misc. 324, 285 N.Y.S. 870 (1936).

A leading case in which this distinction was made is *Richard v. National Transportation Co., supra.* In *Richard,* an individual who was injured as a result of a tortfeasor's negligence was treated by a hospital for his injuries. As did Baylon and the Mussers, Richard executed a document "expressly assigning to the hospital such amount out of his share of the *proceeds of any settlement or judgment* that may result from his claim for damages for personal injuries." *Richard,* 285 N.Y.S. at 872 (emphasis in original). As in Virginia, a New York statute expressly prohibited the assignment of a cause of action for personal injuries. Nevertheless, the New York court concluded that the assignment of proceeds was valid. The court reasoned that an assignment of proceeds was not an assignment of an existing cause of action but instead an assignment of future property. The court also noted that an equitable assignment of the proceeds to be recovered on a personal injury claim did not violate the basis of the nonassignability rule, (i.e., the prevention of champerty and maintenance), because the equitable assignor retained exclusive control over his lawsuit and any settlement thereof.

■ Although research reveals no Virginia case directly on point, this court is of the opinion that the Supreme Court of Virginia would hold that Va.Code § 8.01–26 does not proscribe an equitable assignment of the proceeds to be recovered on a cause of action for personal injuries. The court does not agree with Baylon's contention that *City of Richmond v. Hanes, supra,* is dispositive of this issue.

There a policeman, Hanes, was injured on duty by a negligent tortfeasor. The City paid Hanes' wages during his disability and his hospital and medical bills. After Hanes had brought an action and settled with the tortfeasor for $25,000, the City claimed, by assignment or subrogation, the right to reimbursement from the set-

---

**5.** § 8.01–26. Assignment of causes of action. —Only those causes of action for damage to real or personal property, whether such dam-

age be direct or indirect, and causes of action ex contractu are assignable.

tlement fund. We denied the City's claim on the grounds that Hanes had not agreed to an assignment, that Hanes was not bound by a personnel rule of which he was not aware that purported to give rise to an assignment, and that the City was not subrogated to the extent of its payments either by conventional or legal subrogation. *Collins v. Blue Cross of Virginia,* 193 S.E.2d at 785. And while the City contended in its assignments of error that the trial court erred in holding "[t]hat Hanes' cause of action against Thompson, or the proceeds from the settlement of that cause, was not assignable," *Hanes,* 122 S.E.2d at 897, the court held only "that Hanes' *claim* against Thompson for his bodily injuries was not assignable by Hanes...." *Id.* 122 S.E.2d at 899 (emphasis added). Moreover, the state supreme court apparently did not consider the theory of equitable assignment because that court stated that "[t]here were, of course, no proceeds to assign until the money was paid into court." *Id.* 122 S.E.2d at 898. As the state court did not discuss the issue presented by these appeals, this court does not agree that the court in *Hanes* found no distinction between an assignment of the cause of action itself and an assignment of the proceeds thereof.

To the contrary, some of the reasoning in *Collins* leads this court to believe that the Virginia court would adopt the view expressed in *Richards.*

In *Collins,* the court upheld Blue Cross-Blue Shield's contractual rights of subrogation of hospital and medical payments against the proceeds resulting from Mrs. Collins' personal injury action against a third-party tortfeasor. The court noted "that the effect of the subrogation provision was to impress upon any subsequent recovery by the participant, Mrs. Collins, an equitable lien for amounts advanced for her benefit under the contract." 193 S.E.2d at 785. Thus, in Virginia, an equitable lien may apply to the proceeds of a personal injury recovery.

More importantly, the state court pointed out that "the common law policy against assignment of tort claims [is] designed to prevent trafficking in litigation...." *Collins,* 193 S.E.2d at 785. Accordingly, the supreme court reasoned that by

permitting Blue Cross-Blue Shield to be subrogated to the extent of their payments for Mrs. Collins we do no violence to the [nonassignability rule because] there is no danger of champerty and maintenance, since Blue-Cross-Blue Shield seek to enforce a contractual right of subrogation against sums recovered by a participant from a tortfeasor only to the extent of payments made for the participant's benefit.

*Id.* The state court's reasoning in *Collins* suggests that the prohibition against assignments of person injury claims does not apply to assignments of the proceeds thereof. "In the process of determining whether a particular rule should be applied to a specific set of facts, the reasons underlying the rule should be examined, and when the reasons do not support its application, the rule will not be employed." *Criterion Insurance Co. v. Fulgham,* 219 Va. 294, 299, 247 S.E.2d 404, 407 (1978). This court finds that the reasons underlying the common law rule against assignment of tort claims (now codified in § 8.01–26), to wit: the prevention of champerty and maintenance, do not supports its application in the present cases. The hospitals seek recoveries limited to the value of services actually supplied to the debtors. And the debtors retained complete control over their personal injury cases. The hospitals' rights exist only in the proceeds, not in the debtors' causes of action. The hospitals had no right to proceed against the third-party tortfeasors even if the debtors decided not to pursue their tort claims.

The equitable assignments in these cases may be analogized to an attorney's contingent fee contract. Neither transfers any part of the cause of action. Instead, each operates only on monies, if and when, recovered from third parties. As the enforceability of attorneys' contingent fee arrangements in personal injury claims is well established, the court has difficulty under-

standing why equitable assignments of personal injury proceeds should be declared unenforceable.

The court is also not persuaded by the trustee's argument that personal injury recoveries should not be assignable because a tort victim should be fully compensated for all his damages. Although the court, of course, agrees that full compensation for all damages is a desirable goal, the court sees nothing unique about personal injury damages which requires their not being assignable as a matter of law. In a nonbankruptcy situation, once such damages become liquidated, the tort victim's creditors may proceed against those monies despite the fact that they resulted from a cause of action for personal injuries. And this is true even though the victim might as a result lose his compensation for pain and suffering or diminished future earning power. Similarly, in a bankruptcy situation,

> [I]f the cause of action had been reduced to judgment or settled prior to the filing of the petition, the proceeds would have constituted an asset of the bankruptcy estate. The debtor would suffer the loss of these proceeds except to the extent he could avail himself of the use of the state exemption statutes.

*In re Tignor*, 21 B.R. 219, 222 (Bkrtcy.E.D. Va.1982) (holding debtor's cause of action for personal injuries constituted exempt property under Virginia law). Thus, while it is unfortunate that an accident victim may not be fully compensated for his damages although all his medical bills are paid, the court does not view this as a reason for allowing the victim to avoid paying his just debts in the manner agreed upon by he and his creditor.

█ The court therefore holds that the prohibition against assignments of causes of action for personal injury does not proscribe a hospital from obtaining an equitable assignment of the sums to be recovered by an individual from a tortfeasor to the extent of the value of the services provided by the hospital in treatment of the individual's personal injuries.[6]

### Validity of the Assignments

Roanoke Hospital also appeals the decision of the bankruptcy court that Baylon's execution of the assignment forms did not create a valid assignment of the settlement because the documents were executed by Baylon under a complete misunderstanding of the facts. In so holding, the bankruptcy court found as a matter of fact that Baylon did not understand the importance of the alleged assignments; that he though the documents related to medical records authorizations. That court further found that Baylon did not fully understand the English language, that the language in the documents was vague, and that the hospital employee's explanation of the documents innocently misled Baylon into believing that the only purpose of the documents was to allow his attorney to obtain copies of his medical records. These findings must be accepted for purposes of this appeal because there is evidence to support them.

Roanoke Hospital recognizes this but argues that Baylon's "unilateral" mistake or misunderstanding is insufficient to void the assignments. Mutually of mistake is generally required in order to grant relief for mistake. *See* 13A *Michie's Jurisprudence,* Mistake and Accident § 8 (1978 Repl.Vol.). However, there are exceptions to the requirement of mutuality of mistake. "Mistake on one side, induced by fraud on the other, is grounds for equity interposition, and the same relief is afforded where there has been a mistake on one side accompanied by fraud or other inequitable conduct on the other, as where there has been a mutual mistake." *Id.* at 169.

---

6. In so holding, the court expresses no opinion as to whether Article 9 of the Uniform Commercial Code has displaced the equitable liens doctrine. *See generally* Va.Code § 8.9–203, Comment 5 (1965 Added Vol.); Nickles, *Rethinking Some U.C.C. Article 9 Problems-Subro-* *gation; Equitable Liens; Actual Knowledge; Waiver of Security Interests; Secured Party Liability for Conversion under Part 5,* 34 Ark.L. Rev. 1, 41–71 (1980); Note, *Security Agreements, Equitable Liens, and the Uniform Commercial Code,* 69 Colum.L.Rev. 1280 (1969).

■ Virginia law recognizes that relief may be granted for "false representation whether it was knowingly or innocently made." *B–W Acceptance Corp. v. Benjamin T. Crump Co., Inc.,* 199 Va. 312, 315, 99 S.E.2d 606, 609 (1957).

> The intent of the party making the representation is immaterial. The point is whether the other party was misled. Whether the representation is made innocently or knowingly, if acted on, the effect is the same. In the one case the fraud is constructive; in the other it is actual.

*Id. See also Leeds v. Mundy,* 212 Va. 475, 184 S.E.2d 751 (1971).

■ As there is sufficient evidence to support the bankruptcy court's finding that Baylon was misled by the hospital employee's innocent misrepresentations, that court's determination that the assignments were invalid on the grounds that equity may treat Baylon's unilateral mistake as a mutual mistake must stand.

■ But the bankruptcy court did not rule on whether the Mussers' assignments to Community Hospital were validly executed. Accordingly, that court's Order in Adversary Proceeding No. 7–81–0422 is vacated and the case remanded for additional consideration. The court, however, expresses no opinion as to rights of the equitable assignee vis-a-vis the bankruptcy trustee in the event that the bankruptcy court finds on remand that the Mussers' equitable assignment was validly executed and binding on the parties. *See generally,* Nickles, *supra,* at 61–67 nn. 556–557.

An appropriate Order will be entered this date.