572 A.2d 144

Arturo HERNANDEZ

v.

SUBURBAN HOSPITAL ASSOCIATION, INC.

No. 37 Sept. Term, 1989.

Court of Appeals of Maryland.

April 12, 1990.

Deborah M. Whelihan (Jordan, Coyne, Savits & Lopata, all on brief), Rockville, for appellant.

S. Allen Adelman (Brett Weiss, Adelman & Haldeman, all on brief), Rockville, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, ADKINS and BLACKWELL *, JJ., and THEODORE G. BLOOM, Associate Judge of the Court of Special Appeals, Specially Assigned.

MURPHY, Chief Judge.

This case involves an "Authorization and Assignment" executed by a patient and her attorney for the benefit of a hospital and whether, in the circumstances, the assignment may be enforced against the patient's attorney.

## I.

On September 7, 1985, Giovanna Garcia was involved in an automobile accident and sustained personal injuries. She was treated for those injuries at the Suburban Hospital from September 7 through October 9, 1985, and from May 27–30, 1986. The hospital's charge for services amounted to $18,499. Arturo Hernandez was retained by Garcia as

---

* BLACKWELL, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

her attorney to pursue a claim against the alleged tort-feasor to recover money damages for Garcia's injuries.

In October, 1985, at the time of Garcia's initial release from the hospital, both she and Hernandez each signed a one-page document captioned: "Authorization and Assignment." The document was essentially in two parts, the first signed by Garcia on October 8, and the second signed by Hernandez on October 12. The part signed by Garcia consisted of three paragraphs. In the first paragraph, she authorized the hospital to furnish and disclose to Hernandez all medical information and records requested by him in connection with the injuries she suffered on September 7, 1985. In the second paragraph, she stated:

"I further, irrevocably assign to you, and authorize and direct said attorneys to pay from the proceeds of any recovery in my case all reasonable fees for services provided by you, including fees for preparation and testimony, as a result of the injuries or conditions heretofore mentioned. I understand that this in no way relieves me of my personal primary obligation to pay for such services and that the signing of this form does not prohibit customary billing by you. All bills shall be paid promptly in the usual manner."

The third paragraph was an agreement by Garcia that the statute of limitations with respect to the hospital's claim for services rendered to her would not begin to run until there was a denial by her in writing of any balance claimed to be due.

The second part of the document was signed by Hernandez. It stated:

"THE UNDERSIGNED ATTORNEY FOR THE PATIENT REFERRED TO ABOVE HEREBY AGREES TO COMPLY FULLY WITH THE 'AUTHORIZATION AND ASSIGNMENT' AND AGREES TO ADVISE THE NAMED ASSIGNEE IN WRITING THE STATUS OF THE CLAIM OF THE PATIENT WITHIN TEN (10) DAYS OF THE REQUEST."

On October 16, 1986, prior to any recovery for her personal injuries, Garcia filed a voluntary petition for bankruptcy under Chapter 7 of the Bankruptcy Act. In the schedules attached to her petition, she listed the hospital as an unsecured creditor. She did not disclose her lawsuit as a contingent asset, or her execution of the "Authorization and Assignment" to the hospital.[1] In due course, the hospital received a form notice of the bankruptcy filing, but that notice contained the statement, prominently placed and in italics:

"Creditors: Do *NOT* file claims at this time. Debtor schedules indicate no assets exist from which to receive a dividend."

The hospital took no action and did not participate in the bankruptcy proceeding.

Garcia was discharged in bankruptcy on March 7, 1987. Thereafter, she settled her personal injury claim for $35,-000. On June 5, 1987, Hernandez received the settlement check from the defendant's insurer; it was payable jointly to him and Garcia. Without notifying the hospital of the settlement, or his receipt of the check, Hernandez deducted his fee and expenses and disbursed the balance to Garcia.

The hospital had been sending Garcia bills and dunning notices since December, 1985. At some point in that month, it also wrote to Hernandez, reminding him of the Authorization and Assignment and asking that he advise the hospital of the status of the case and when it might expect payment. On June 11, 1987—six days after he had received the check—Hernandez informed the hospital of Garcia's discharge in bankruptcy and advised it that "any further attempt to collect on the discharged debt would be in direct violation of the [Bankruptcy Judge's] Order." This response provoked a demand by the hospital on Hernandez for payment of $18,499, plus interest.

---

1. In the circuit court, counsel for Hernandez asserted that an amended schedule had been filed disclosing the lawsuit; however, no amended schedule appears in the record.

Subsequently, after Hernandez declined to pay the hospital bill, the hospital sued Hernandez in the Circuit Court for Montgomery County. The complaint, which had appended to it a copy of the Authorization and Assignment, alleged that Hernandez signed the document "in exchange for Suburban agreeing to provide medical records and bills [to him] and deferring collection procedures as to Garcia"; and that Hernandez agreed to pay the hospital "from the proceeds of any recovery by Garcia in connection with the accident."

After a hearing on cross-motions for summary judgment, the court (McAuliffe, James S., Jr.) entered judgment for the hospital in the amount of its bill, plus interest. He concluded that in signing the second part of the Authorization and Assignment, "[w]hat Hernandez, as the attorney, agreed to do was a separate and collateral undertaking." More specifically, Judge McAuliffe described Hernandez's "undertaking" in these words:

"[H]is undertaking was that in consideration of your cooperating with me, furnishing me with the information that I need concerning my client, the bills, the reports, the records that I need, in consideration of that, I will protect your interest, and monies that come into my hands will be held there and will not be paid out until you are paid. That's a separate and collateral undertaking, and is not part of a primary responsibility which remained always with the debtor."

Hernandez appealed to the Court of Special Appeals, contending that

(1) The Authorization and Assignment did not suffice to create a contractual liability on his part;

(2) The court's conclusion that he had failed to comply with his agreement was "clearly erroneous";

(3) Garcia's discharge in bankruptcy precludes any collateral enforcement of the debt against him; and

(4) The hospital's claim was barred by the doctrines of waiver and estoppel.

We granted certiorari prior to decision by the intermediate appellate court to consider the important issues raised in the case.

## II.

The hospital contends that Garcia irrevocably assigned to it all of her interest in any settlement of her claim, up to the amount of its bill, and that, when Hernandez received the settlement check, that part of the money previously assigned legally belonged to the hospital. Hernandez is liable, it urges, because, with notice of the assignment and the hospital's right to the fund, he paid the money to Garcia rather than to it. Hernandez, on the other hand, views the document merely as an authorization to him to pay Garcia's debt to the hospital from the proceeds of any recovery realized from her personal injury claim. He contends that Garcia alone was responsible for that debt, and that her responsibility was extinguished by her discharge in bankruptcy, which occurred before the settlement proceeds were received.

In determining whether the document constituted a valid assignment and, if so, what it assigned, we must first "determine the intentions of the parties from the language of the contract itself, not by what a party to the contract intended it to mean, or thought it meant, but 'what a reasonable person in the position of the parties would have thought it meant.'" *James v. Goldberg*, 256 Md. 520, 527, 261 A.2d 753 (1970), quoting in part from *Chesapeake Isle, Inc. v. Rolling Hills Development Company, Inc.*, 248 Md. 449, 453, 237 A.2d 1 (1968). As earlier observed, the first paragraph of the document authorized the hospital to disclose medical information to Hernandez. In the second paragraph, Garcia stated that "I further, irrevocably assign to you [the hospital], and authorize and direct said attorneys to pay from the proceeds of any recovery in my case all reasonable fees for services provided by you...." In the part of the document signed by Hernandez, the hospital is

referred to as "the named assignee." A fair and reasonable reading of this language can leave little doubt that the document signed by Garcia and Hernandez was intended to constitute an assignment, the subject of which was "the proceeds" from any monetary recovery obtained in Garcia's tort case. The language cannot reasonably be read otherwise.

### III.

■ It was the common law rule that causes of action for personal injuries could not be assigned. *See* 6 Am.Jur.2d *Assignments* § 37 (1963); Annotation, *Assignability of Proceeds of Claim for Personal Injury or Death*, 33 A.L.R.4th 82 (1984). The rule seemed to be predicated on the common law principle that such actions did not survive the death of the plaintiff-assignor. Moreover, some courts found public policy objections to the assignment of those kinds of claims, principally the fear of champerty and maintenance. *See Karp v. Speizer*, 132 Ariz. 599, 647 P.2d 1197 (App.1982); *City of Richmond v. Hanes*, 203 Va. 102, 122 S.E.2d 895 (1961).

Other courts, while continuing to recognize the non-assignability of personal injury *claims*, have distinguished between the assignment of the claim itself and an assignment of all or part of the proceeds that may be recovered from the claim. In *In re Musser*, 24 B.R. 913 (W.D.Va. 1982), the court, applying Virginia law and recognizing the non-assignability of personal injury claims under that law, nonetheless sustained an assignment of potential proceeds to a hospital. In response to the "public policy" argument, it stated at 921–22:

> "The hospitals seek recoveries limited to the value of services actually supplied to the debtors. And the debtors retained complete control over their personal injury cases. The hospitals' rights exist only in the proceeds, not in the debtors' causes of action. The hospitals had no right to proceed against the third-party tort-feasors even if the debtors decided not to pursue their tort claims.

"The equitable assignments in these cases may be analogized to an attorney's contingent fee contract. Neither transfers any part of the cause of action. Instead, each operates only on moneys, if and when, recovered from third parties. As the enforceability of attorneys' contingent fee arrangements in personal injury claims is well established, the court has difficulty understanding why equitable assignments of personal injury proceeds should be declared unenforceable."

*See also Kuhns v. Standard Oil Co. of Cal., Western Oper.*, 257 Or. 482, 478 P.2d 396, 405 (1971); *In re Duty*, 78 B.R. 111 (Bankr.E.D.Va.1987); *In re Mucelli*, 21 B.R. 601 (Bankr.S.D.N.Y.1982); *Grossman v. Schlosser*, 19 App. Div.2d 893, 244 N.Y.S.2d 749 (1963); *Cassetta v. Del Frate*, 116 Cal.App. 255, 2 P.2d 533 (1931).

Not all courts have adopted that approach. *See Harvey v. Cleman*, 65 Wash.2d 853, 400 P.2d 87 (1965); *Karp v. Speizer, supra; Southern Farm Bureau Cas. Ins. Co. v. Wright Oil Co.*, 248 Ark. 803, 454 S.W.2d 69 (1970). Essentially, these courts have found the distinction to be one without a difference and have applied the same public policy considerations disfavoring the assignment of claims to the assignment of proceeds from claims.

■ In Maryland, "[a]n unliquidated tort claim for money damages for personal injuries is encompassed within the definition of a chose in action." *Unkle v. Unkle*, 305 Md. 587, 594, 505 A.2d 849 (1986). In *Summers v. Freishtat*, 274 Md. 404, 409, 335 A.2d 89 (1975), we recognized the modern rule that "a chose in action in tort is generally assignable, in the absence of a statutory prohibition, if it is a right which would survive the assignor and could be enforced by his personal representative." In this regard, Maryland Code (1989 Repl.Vol.), § 6–401 of the Courts and Judicial Proceedings Article provides that, except for slander, causes or rights of action survive the death of either party.

As to public policy considerations, at least in the setting now before us, we see no danger of champerty or maintenance, nor any other public policy reason to preclude the assignment of expected personal injury claim benefits to secure hospital or medical expenses actually incurred. Indeed, there is good reason to enforce such assignments.

The cost of health care may be considerable, as it was in this case, and patients injured by the actions of others are often not in a position to pay for that care at the time they need and receive it. Those costs are frequently the major element of special damage in the tort case. On the other hand, funds recovered from such tort actions are not subject to execution by judgment creditors. See Code, § 11–504(b)(2) of the Courts Article. Thus, if the assignment of those funds is not permitted, the health care provider may be forced to pursue its claim expeditiously against the patient, a likely effect of which will be to involve the patient in double litigation and put at risk the patient's personal assets. Enforcement of an assignment can avoid this problem; if given some assurance of payment from the proceeds received from the tort action, the hospital may forego immediate collection efforts and thus allow the patient a measure of financial stability. We therefore recognize the validity of such assignments of the proceeds of a tort claim for personal injuries.

In *James v. Goldberg, supra,* 256 Md. at 527, 261 A.2d 753, we said that "[a]n unqualified assignment generally operates to transfer to the assignee all of the right, title and interest of the assignor in the subject of the assignment." *See also Central Collection v. Columbia Medical,* 300 Md. 318, 331, 478 A.2d 303 (1984). In these circumstances, the assignment vests equitable title to the assigned funds in the assignee. *Seymour v. Finance & Guaranty Co.,* 155 Md. 514, 531, 142 A. 710 (1928). *See also Miller v. Horowitz,* 172 Md. 419, 430, 191 A. 906 (1937). Thus, upon delivery of the signed Authorization and Assignment to the hospital in this case, all of Garcia's right, title and interest in any proceeds recovered from her tort action,

up to the amount of the hospital's bill for services rendered, was equitably transferred to the hospital, *i.e.*, from monies payable to Garcia after satisfaction of Hernandez's fee and chargeable expenses. Although the record is not clear as to the amount of the fee and expenses, or what was actually paid to Garcia, Hernandez did not contest the amount of the hospital's judgment. We assume, therefore, that but for the assignment, Garcia would have been entitled to receive at least $18,499 from the funds recovered.

■ There is no merit to Hernandez's contention that he fully complied with his obligation to the hospital. He mistakenly assumes that his only obligation was to provide, upon request, written notice of the status of Garcia's claim. But in bold letters, he agreed "to comply fully with the foregoing 'Authorization and Assignment.'" As we have indicated, that document not only assigned Garcia's recovery to the hospital but specifically directed Hernandez to pay the hospital's fees from that recovery. That is what Hernandez agreed but failed to do and that is the basis of the action against him. In this setting, Hernandez was in the position of a debtor to Garcia; but for the assignment and direction to pay the hospital, he would have owed her the money. The general rule, as stated in 6 Am.Jur.2d *Assignments* § 96 (1963), is that "if, after receiving notice or obtaining knowledge of the assignment, the debtor pays, or compromises with the assignor, he will not be protected as against the assignee." *See also Spiker v. Nydegger*, 30 Md. 315 (1869); *Shriner v. Lamborn*, 12 Md. 170 (1858); *Goldwater v. Fisch*, 261 App.Div. 226, 25 N.Y.S.2d 84, *reh. and appeal denied*, 261 App.Div. 1056, 27 N.Y.S.2d 463 (1941). Hernandez's liability is not based on any undertaking to be responsible for Garcia's debt but rather on his failure to discharge his own obligation to pay over the fund that came into his possession.

■ There is some support for Hernandez's argument that the discharge of Garcia's obligation to the hospital sufficed to preclude enforcement of the assignment, which

was originally taken as security for that obligation. *See, e.g., Gannon v. Graham,* 211 Iowa 516, 231 N.W. 675 (1930); *Brown v. Cunningham,* 303 Ill.App. 307, 25 N.E.2d 113 (1940). The more modern, and we think the correct rule, is to the contrary. It is based on the generally accepted premise that the assignee of a chose in action acquires an equitable lien upon the *res* which, unless disallowed or voided, survives the bankruptcy. As expressed in *Estate of Lellock v. Prudential Ins. Co. of America,* 811 F.2d 186, 189 (3rd Cir.1987):

> "While a minority of opinions have held that prefiling liens of secured creditors which are not disallowed or avoided in bankruptcy proceedings do not survive a bankruptcy discharge of the underlying debt ... we decline to follow this line of reasoning as it is clearly repugnant to bankruptcy policy.... We instead follow the majority of courts which hold that the Bankruptcy Code and its legislative history plainly establish the better rule of law—that valid liens that have not been disallowed or avoided survive the bankruptcy discharge of the underlying debt."

*See also United Presidential Life Ins. Co. v. Barker,* 31 B.R. 145 (N.D.Tex.1983); *In re Reef Petroleum Corp.,* 92 B.R. 741 (Bankr.W.D.Mich.1988); *In re Bouchelle,* 98 B.R. 81 (Bankr.M.D.Fla.1989). Even the Illinois court that decided *Brown v. Cunningham, supra,* now follows this rule. *See Holesinger v. Dubuque Feeder Pig Co., Inc.,* 104 Ill. App.3d 39, 59 Ill.Dec. 859, 432 N.E.2d 645 (1982).

■ Consistent with this view, we conclude that the discharge in bankruptcy of Garcia's debts did not vitiate or render unenforceable the assignment to the hospital of the proceeds of her tort claim. We reject Hernandez's final argument that, by failing to file a claim in the bankruptcy proceeding or to object to Garcia's discharge, the hospital is barred from enforcing the assignment by reason of waiver or estoppel. The hospital was entitled to rely on the assignment and, there being no indication that anyone was attempting to disallow or avoid its equitable lien, the hospital

**238**

had no obligation to become involved in the bankruptcy proceeding.

JUDGMENT AFFIRMED; APPELLANT TO PAY COSTS.