2002-NMCA-080

51 P.3d 1172

QUALITY CHIROPRACTIC, PC, Plaintiff–Appellant,

v.

FARMERS INSURANCE COMPANY OF ARIZONA, Defendant–Appellee.

No. 22,439.

Court of Appeals of New Mexico.

June 14, 2002.

Alexander A. Wold, Jr. Alexander Wold & Associates, P.C. Albuquerque, NM, for Appellant.

Amina Quargnali–Linsley Miller, Stratvert & Torgerson, P.A. Albuquerque, NM, for Appellee.

## OPINION

PICKARD, Judge.

{1} Plaintiff, a chiropractic clinic, provided treatment to a patient who suffered injuries in a car accident. The patient signed a document granting Plaintiff an "assignment and lien" in any proceeds that he received from claims arising out of the accident. The patient later reached a settlement agreement with the driver and Defendant, the driver's insurer, without providing for payment to Plaintiff. Plaintiff brought suit against Defendant, seeking to enforce its assignment rights in the proceeds of the settlement. The district court granted Defendant's motion for summary judgment. Plaintiff urges us to allow an injured accident victim to assign the proceeds of any judgment or settlement from a personal injury claim and to enforce such assignment against an insurance company that has already paid the victim. We decline to do so, and we therefore affirm the judgment of the district court.

## FACTS

{2} The patient was involved in a collision with another driver. He did not have insurance and could not afford to pay for medical treatment. When he sought treatment from Plaintiff, he signed a document titled "Irrevocable Lien and Assignment." The document contained the following language:

I hereby irrevocably authorize and direct any person or entity who is or may become obligated to pay money to me or to pay money on my behalf as a result of any claims arising from the above accident (including my attorney, my insurance company, and any other insurance company) to pay directly to Quality Chiropractic, PC from the proceeds of any settlement, judgment or verdict arising from my claims such sums as may be due and owing to Quality Chiropractic, PC for medical goods and services provided to me as a result of this accident, and to withhold such sums from payment of any settlement, judgment or verdict to me. I hereby further give a lien and assignment on my claims to Quality Chiropractic, PC against any and all proceeds of any settlement, judgment, or verdict.

I fully understand that I am directly and fully responsible to Quality Chiropractic, PC for all medical bills submitted by Quality Chiropractic, PC for goods and services provided to me and that this agreement is made solely for the additional protection of Quality Chiropractic, PC. In consideration for this agreement, Quality Chiropractic, PC agrees to await full payment on its bills, and to provide medical information about my treatment and condition to me and my attorney. I further understand the payment of my bills is not contingent on my recovery of any settlement, judgment, or verdict on my claims.

{3} Plaintiff twice sent a copy of the document to Defendant. It also sent notes and bills to Defendant every two weeks updating the patient's treatment progress. The final bill reflected $1,388.10 in charges. The patient met with Defendant to settle his claim against the other driver. When Defendant asked about Plaintiff's bills, the patient indicated that he would pay Plaintiff out of the settlement funds. Defendant and the patient agreed to settle the claim for $2,800. The patient never paid Plaintiff for its services.

{4} Plaintiff filed a complaint against Defendant in district court, claiming that Defendant had an obligation to honor the written assignment. Plaintiff and Defendant filed cross-motions for summary judgment. The district court denied Plaintiff's motion and granted summary judgment in favor of Defendant, and Plaintiff appealed to this Court.

## DISCUSSION

{5} The question on appeal is whether an assignment of the proceeds from a personal injury claim is enforceable in New Mexico against a third-party obligor. Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. We review questions of law de novo. *Id.*

{6} "An 'assignment' is a transfer of property or some other right from one person (the 'assignor') to another (the 'assignee')...." 6 Am.Jur.2d *Assignments* § 1 (1999); *see Benton v. Albuquerque Nat'l Bank*, 103 N.M. 5, 10, 701 P.2d 1025, 1030 (Ct.App.1985). A creditor can assign its interest in an existing debt owed to it. 6 Am.Jur.2d *Assignments* § 33 (1999); *see Time Fin. Corp. v. Johnson Trucking Co.*, 23 Utah 2d 115, 458 P.2d 873, 875 (Utah 1969). The debtor, or obligor, must then pay the debt to the assignee, not the assignor. 6 Am.Jur.2d *Assignments* § 140 (1999). This is routinely done with loans or credit card debt that is transferred from one bank to another. Generally, the consent of the obligor is not required. Restatement (Second) of Contracts § 280 cmt. d; § 323 cmt. a (1981); 6 Am.Jur.2d *Assignments* § 20 (1999). An obligor with notice of an assignment is required to pay the assignee. *Romero v. Earl*, 111 N.M. 789, 790, 810 P.2d 808, 809 (1991). After receiving notice of the assignment, the obligor cannot lawfully pay the amount assigned either to the assignor or to its other creditors, and if the obligor does make such a payment, it does so at its peril, because the assignee may enforce its rights against the obligor directly. *See Herzog v. Irace*, 594 A.2d 1106, 1108 (Me.1991).

{7} Plaintiff also describes its purported interest in the patient's settlement proceeds as a "medical lien." An assignment creates an equitable lien in favor of the assignee. *See Kahnt v. Jones McKeen Mercantile Co.*, 32 N.M. 537, 540, 260 P. 673, 674

(1927) ("Equity has . . . long recognized that a debtor may make an assignment or appropriation of a particular fund which will give rise to a lien upon it in favor of his creditor."); *Hernandez v. Suburban Hosp. Ass'n, Inc.*, 319 Md. 226, 572 A.2d 144, 148 (1990) (indicating that assignment vests equitable title in assignee). The ultimate question, however, is whether the document signed by the patient created a valid assignment. Plaintiff does not claim that it can assert a statutory or common law lien against the patient's settlement. *Cf.* New Mexico Hospital Liens Act, NMSA 1978, §§ 48–8–1 to–7 (1961 as amended through 1995) (authorizing hospitals to assert a lien on any future judgments when treating uninsured accident victim). As Defendant notes, the legislature did not include independent physicians and health care providers within the purview of the Hospital Liens Act. To avoid confusion, we describe Plaintiff's claim as one to enforce an assignment, not a lien.

## Background

{8} In medieval times, the common law prohibited the assignment of any "chose in action." *See* Max Radin, *Maintenance by Champerty*, 24 Cal. L.Rev. 48, 54 (1935). All litigants were prohibited from assigning the rights to their cause of action. As this rule became unworkable, courts carved out exceptions, and eventually allowed assignments in commercial disputes. *See Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 340 (Ind.1991). Personal injury claims, however, remained unassignable. *See Berlinski v. Ovellette*, 164 Conn. 482, 325 A.2d 239, 241–42 (1973), *overruled on other grounds by Westchester Fire Ins. Co. v. Allstate Ins. Co.*, 236 Conn. 362, 672 A.2d 939 (1996); Restatement (Second) of Contracts § 317 cmt. c (1981); 6 Am. Jur.2d *Assignments* § 64 (1999). A trio of early New Mexico decisions recognized the common law rule prohibiting the assignment of personal injury claims, although none directly addressed that particular issue. *See Young v. N.M. Broad. Co.*, 60 N.M. 475, 479, 292 P.2d 776, 779 (1956) (holding that the owner of a television repair shop could maintain a cause of action on behalf of the company after accepting an assignment of all rights in the partnership from his former business partner), *criticized on other grounds by Reed v. Melnick*, 81 N.M. 608, 611, 471 P.2d 178, 181 (1970); *Parker v. Beasley*, 40 N.M. 68, 79, 54 P.2d 687, 693–94 (1936) (holding that heirs to land could bring an action to enforce a covenant in the warranty deed); *Kandelin v. Lee Moor Contracting Co.*, 37 N.M. 479, 490, 24 P.2d 731, 737 (1933) (analyzing employer's right of reimbursement under worker's compensation statute).

{9} One justification for the common law rule was that personal injury claims did not survive the death of the victim. *See Gregory v. Lovlien*, 174 Or.App. 483, 26 P.3d 180, 181–82 (2001) (discussing historical connection between survivability and assignability); *Parker*, 40 N.M. at 72, 54 P.2d at 689 (same). Some jurisdictions abandoned the prohibition on the assignment of personal injury claims once their legislatures passed survivorship statutes allowing personal injury claims to descend to a personal representative. *See, e.g., Wells v. Edwards Hotel & City Ry. Co.*, 96 Miss. 191, 50 So. 628, 629 (1909) (representing an early case); *Picadilly, Inc.*, 582 N.E.2d at 340–41 (containing a more modern rationale).

■ {10} The main concern, however, was that assignment of personal injury claims would lead to unscrupulous trafficking in litigation as a commodity. Common law courts were concerned with the practices of champerty and maintenance. "Champerty is the intermeddling of a stranger in the litigation of another, for profit, and maintenance is the financing of such intermeddling." *Groce v. Fid. Gen. Ins. Co.*, 252 Or. 296, 448 P.2d 554, 558 (1968). Champerty was a practice somewhat akin to the modern day class action. A litigant would consolidate small land claims in order to create a larger estate. *See* Radin, *supra*, at 60–61. In exchange for fronting the costs of litigation, the lead plaintiff took an interest in any land recovered (becoming a "tenant by champart," or partial owner of the land). *Id.* The act was considered unsavory in part because the interest in land was usually worth far more than the costs expended by the lead plaintiff. *Id.* Even as this particular practice waned, the act of purchasing litigation was still termed champerty. *Id.*

{11} Some modern courts are still concerned with the possibility that a "litigious person could harass and annoy others if allowed to purchase claims for pain and suffering and pursue the claims in court as assignees." *Claudy v. Commw. Edison Co.*, 255 Ill.App.3d 714, 193 Ill.Dec. 537, 626 N.E.2d 1088, 1092 (1993) (internal quotation marks and citation omitted). The purchaser, it is argued, will have a stronger motive to pursue a claim than the actual victim, thereby increasing the burden on the defendants. Nonetheless, it appears that more modern cases would enforce the assignment created in this case. *See generally* Andrea G. Nadel, Annotation, *Assignability of Proceeds of Claim for Personal Injury or Death*, 33 A.L.R.4th 82, 1984 WL 263328 (1984). As noted above, a number of jurisdictions have abandoned the common law rule altogether and now allow the assignment of any cause of action. *See, e.g., Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 533 (Iowa 1995). Some state legislatures have authorized independent physicians to assert liens against a patient's judgment or settlement. *See, e.g.,* Alaska Stat. § 34.35.450 (2001). Several other jurisdictions take the position Plaintiff urges us to adopt today. These courts prohibit the assignment of a cause of action, but allow an injured party to assign the proceeds of any future judgment. *See, e.g., Charlotte–Mecklenburg Hosp. Auth. v. First of Georgia Ins. Co.*, 340 N.C. 88, 455 S.E.2d 655, 657 (1995). The key difference, these courts explain, is that the injured tort victim maintains control over the cause of action.

There is a distinction between the assignment of a claim for personal injury and the assignment of the proceeds of such a claim. The assignment of a claim gives the assignee control of the claim and promotes champerty. Such a contract is against public policy and void. The assignment of the proceeds of a claim does not give the assignee control of the case and there is no reason it should not be valid.

*Id.* (internal citation omitted). In addition, these courts have determined that the common law rule is no longer justified. "[W]e see no danger of champerty or maintenance, nor any other public policy reasons to preclude the assignment of expected personal injury claim benefits to secure hospital or medical expenses actually incurred." *Hernandez*, 572 A.2d at 148. In fact, these courts believe there are good policy reason to enforce these assignments, and they rely on the need for medical care by those tort victims otherwise unable to afford it, as well as a perceived analogy between these assignments and attorneys' contingent fee arrangements. *Id.* at 147–48; *see also In re Musser*, 24 B.R. 913, 921–22 (W.D.Va.1982).

{12} A few jurisdictions, however, have rejected this distinction and continue to prohibit both the assignment of personal injury claims and the assignment of future proceeds arising out of personal injury claims. *See, e.g., Karp v. Speizer*, 132 Ariz. 599, 647 P.2d 1197, 1199 (Ariz.Ct.App.1982) (quoting a Washington state court decision as stating "[a]t best this is a distinction without a difference"). While we are not impressed with the reasoning concerning "a distinction without a difference," we believe that there are policy reasons unexplored by the modern cases, and those policy reasons counsel our deference to the legislature in this instance.

*New Mexico Law*

■ {13} Plaintiff urges us to adopt the distinction between the assignment of personal injury claims and the assignment of future proceeds from personal injury claims. Without the ability to grant assignments in future proceeds, Plaintiff argues, some injured tort victims will be unable to receive needed health care services. Plaintiff also argues that, because the injured tort victim will still retain control over the course of litigation, there is no danger of champerty or intermeddling with the litigation.

{14} Current New Mexico case law provides little guidance in resolving this question. While the early cases cited above recognized the rule against assigning a personal injury cause of action, those cases did not address the assignment of future proceeds. Later, our Supreme Court discussed the assignment of personal injury claims in the context of insurance subrogation. *See Motto v. State Farm Mut. Auto. Ins. Co.*, 81 N.M. 35, 462 P.2d 620 (1969). In *Motto*, the plain-

tiff argued that the subrogation clause in his insurance policy was invalid as an assignment of his personal injury claim. *Id.* at 36, 462 P.2d at 621. The *Motto* Court identified two possible rationales for allowing subrogation. *Id.* First, some courts had concluded that subrogation was not an assignment at all, but merely operated as a lien on the proceeds of an injury claim. *Id.* The *Motto* Court rejected that argument. *Id.* The other possibility, the Court observed, was that "claims for personal injuries are assignable and ... the subrogation clause works such an assignment." *Id.*

{15} The *Motto* Court concluded that personal injury claims are assignable. *Id.* However, we must question the premise on which the Court reached this conclusion. The Court asserted that New Mexico's Worker's Compensation Act (WCA) had authorized the assignment of claims against third parties responsible for injuries to workers. *Id.* This assertion appears incorrect. Although the worker's compensation statutes—then and now—use the word "assignment," our courts have consistently construed the Act as granting an employer a right of reimbursement, not an assignment. *See Kandelin,* 37 N.M. at 489, 24 P.2d at 736; *St. Joseph Healthcare Sys. v. Travelers Cos.,* 119 N.M. 603, 606, 893 P.2d 1007, 1010 (Ct.App.1995). Relying on this premise, the *Motto* Court decided that there was "no reason why an insurance contract which has the same effect should not be binding." *Motto,* 81 N.M. at 36, 462 P.2d at 621. The *Motto* Court then held that an insurance policy holder can assign his cause of action through a subrogation clause in the policy. *Id.* at 36–37, 462 P.2d at 621–22.

{16} Eleven years later, this Court addressed another case involving subrogation. *See Seaboard Fire & Marine Ins. Co. v. Kurth,* 96 N.M. 631, 633 P.2d 1229 (Ct.App. 1980). In *Seaboard Fire & Marine Insurance Co.,* a worker had issued a written "subrogation receipt" to his employer, who had paid worker's compensation benefits for worker's injury. *Id.* at 635, 633 P.2d at 1233. The *Seaboard Fire & Marine Insurance Co.* Court observed that the worker's compensation statute did *not* grant the employer an assignment in the worker's personal injury

action. *Id.* Then, citing *Motto* for the proposition that personal injury claims are *assignable,* the *Seaboard Fire & Marine Insurance Co.* Court held that the worker could grant the employer an assignment in his personal injury claim. *Id.* at 634, 633 P.2d at 1232. The *Seaboard Fire & Marine Insurance Co.* Court found nothing in the worker's compensation act that prevented worker and employer from reaching a private agreement, and therefore held that the worker's assignment was valid and enforceable. *Id.* at 634–35, 633 P.2d at 1232–33. The *Seaboard Fire & Marine Insurance Co.* Court did not recognize that, had the *Motto* court been correct in asserting that the WCA created a right of assignment, the employer would not need an assignment from the worker.

{17} No subsequent cases have addressed the validity of personal injury assignments. The parties debate the impact of *St. Joseph Healthcare System* and *Romero. St. Joseph Healthcare System,* however, involved an employer's right to reimbursement under the worker's compensation statute, not a right of assignment. *See id.* at 606–07, 893 P.2d at 1010–11. Unlike the employer in *Seaboard Fire & Marine Insurance Co.,* the employer in *St. Joseph Healthcare System* did not obtain a contractual assignment from the injured worker. *Id.* at 607, 893 P.2d at 1011. In *Romero,* the Supreme Court enforced an agreement similar to the one at issue in this case. *See Romero,* 111 N.M. at 790, 810 P.2d at 809. The Court, however, expressly did not address the question raised here, because the parties did not raise the issue. *Id.* at 790 n. 2, 810 P.2d at 809 n. 2. *Romero* cannot be construed as either approving or disapproving the assignment of personal injury claims. *See Fernandez v. Farmers Ins. Co.,* 115 N.M. 622, 627, 857 P.2d 22, 27 (1993) (stating general rule that cases are not authority for proposition not considered).

{18} Plaintiff argues that these prior cases show a general approval for the assignment of the proceeds from personal injury claims. It posits a hypothetical accident victim. The victim receives some medical treatment paid for through an insurance policy (Insurer). He then sees Doctor I, whose services are not covered by his insurance. He grants

Doctor I an assignment of the proceeds of his accident claim. He hires Attorney to represent him. He then goes to Doctor II to get additional treatment not covered by insurance. This time, both he and his attorney sign a document assigning proceeds to the doctor.

{19} The victim then collects a judgment from the tortfeasor. Attorney collects a contingency fee, which is taken directly from the judgment. Insurer, who asserted its subrogation rights and was joined as a party to the litigation, is paid directly by the tortfeasor. *See Amica Mut. Ins. Co. v. Maloney,* 120 N.M. 523, 527, 903 P.2d 834, 838 (1995). Attorney is obligated to pay Doctor II out of the judgment proceeds. *See In re Moore,* 2000–NMSC–019, ¶ 4, 129 N.M. 217, 4 P.3d 664; *Romero,* 111 N.M. at 791, 810 P.2d at 810. The only party without recourse, unless he can collect a judgment directly from the patient, is Doctor I, who accepted an assignment from the patient without a guarantee from the patient's attorney.

{20} Plaintiff's hypothetical raises two questions. First, why can Attorney, Insurer, and Doctor II take proceeds directly from the judgment, while Doctor I cannot? In other words, why is an insurance company that paid for medical services entitled to more protection than a physician who provided services directly? Second, if our courts will enforce a patient's promise to pay a creditor directly or through an attorney, why do we refuse to enforce a patient's assignment?

*Assignment versus Subrogation and Contingency Fees*

■■■ {21} As to the first question, we think there are substantive differences between subrogation agreements and contingency fee contracts, on the one hand, and assignments, on the other. Subrogation developed as an equitable doctrine intended to avoid unjust enrichment. "[S]ubrogation gives the payor a right to collect what it has paid from the party who caused the damage." *White v. Sutherland,* 92 N.M. 187, 190, 585 P.2d 331, 334 (Ct.App.1978). The right of subrogation allows an insurer who has fully compensated the insured to step into the shoes of the insured and collect what it has paid from the wrongdoer. *Amica Mut. Ins. Co.,* 120 N.M. at 527, 903 P.2d at 838. The subrogee, therefore, is never a volunteer choosing to become involved in litigation; only those with a duty to pay can assert subrogation rights. *See Imel v. Travelers Indem. Co.,* 152 Ind.App. 75, 281 N.E.2d 919, 921 (1972) (distinguishing subrogation and assignment). Thus, the doctrine of subrogation does not invite strangers to become unnecessarily involved in litigation. The subrogated insurer has a pre-existing duty under the insurance policy to pay out benefits to its insured. A party accepting an assignment, on the other hand, does so after the accident has already occurred, and inserts itself into the litigation. Plaintiff had no obligation to treat the patient, and no obligation to accept an assignment.

■■■ {22} Because the subrogated insurer has a pre-existing duty to pay, it bears the risk that the insured will be unable to obtain compensation from the tortfeasor. This is one of the primary benefits of insurance. The same was true in *Seaboard Fire & Marine Insurance Co.,* where the employer had a statutory obligation to pay out worker's compensation benefits. If there was no recovery from the third-party tortfeasor in that case, the employer would have no additional recourse to seek reimbursement for the benefits it paid to the worker. Plaintiff in this case bore no such risk. It elicited a promise from the patient that he pay the bills if he was unable to recover for his accident. Plaintiff is essentially a creditor who sought a better guarantee of payment by demanding that the patient grant an assignment in any proceeds from his claim against the other driver.

■■■ {23} In addition, the doctrine of subrogation applies by necessity only to benefits paid directly for damages resulting from an injury-causing accident. An insurer will be subrogated to the extent that it has paid out benefits to the tort victim for injuries caused by the tortfeasor. In contrast, if accident victims could use assignments as currency, they could issue assignments for any purpose and in any amount. Some states have already confronted abuse of the

assignment device. *See, e.g., Lewis v. Kubena*, 800 So.2d 68, 72 (La.Ct.App.2001) (refusing to enforce similar assignments to a finance company). Plaintiff argues that we could limit the assignments for medical services only, but we see no legitimate basis on which to make such a distinction. There may be other services that a tort victim feels are equally necessary to facilitate recovery. The tort victim may indeed feel that paying off an unrelated debt is necessary to restore peace of mind. Such a rule would leave defendants unsure of which assignments are enforceable and which are not.

■ {24} Another difference is that courts can apply equitable doctrines in subrogation cases to protect the rights of the insured. *See Kahrs v. Sanchez*, 1998–NMCA–037, ¶ 29, 125 N.M. 1, 956 P.2d 132; *Amica Mut. Ins. Co.*, 120 N.M. at 528–29, 903 P.2d at 839–40. For example, one persistent criticism of subrogation is that subrogated insurers will seek reimbursement even when the insured tort victim has not been fully compensated for all damages, including pain and suffering. *See Allstate Ins. Co. v. Druke*, 118 Ariz. 301, 576 P.2d 489, 492 (1978) (en banc) (holding medical pay subrogation provisions invalid on public policy grounds). Some courts have addressed this problem by applying the "made-whole" rule, allowing reimbursement only when the insured tort victim has been fully compensated. *See, e.g., Shelter Mut. Ins. Co. v. Kennedy*, 347 Ark. 184, 60 S.W.3d 458, 461–62 (2001). Our courts have applied the doctrine of equitable apportionment, reducing the amount reimbursed to the subrogated insurer when the insured tort victim's recovery represents only a portion of actual damages. *See White*, 92 N.M. at 192, 585 P.2d at 336. It is not clear that a physician's right to reimbursement based on an assignment could be similarly reduced. *See Kahrs*, 1998–NMCA–037, ¶¶ 16, 29, 125 N.M. 1, 956 P.2d 132 (discussing difference between right to receive reimbursement through assignment and subrogation rights). As a creditor, a physician is entitled to payment in full. If the physician's portion of the judgment were reduced, the physician would still be entitled to payment directly from the patient, defeating the purpose of equitable apportionment. A subrogated insurer is also obligated to pay a portion of any attorney fees, *see Amica Mut. Ins. Co.*, 120 N.M. at 528–29, 903 P.2d at 839–40, as is a hospital that collects reimbursement through a judgment lien, *see Martinez v. St. Joseph Healthcare Sys.*, 117 N.M. 357, 360, 871 P.2d 1363, 1366 (1994), and a worker's compensation employer, *see Transport Indem. v. Garcia*, 89 N.M. 342, 344, 552 P.2d 473, 475 (Ct.App.1976). Again it is not clear and we do not decide whether this doctrine would extend to a physician who accepted an assignment, but who would expect full payment for the services provided, regardless of the amount the patient was able to recover. *See City & County of San Francisco v. Sweet*, 12 Cal.4th 105, 48 Cal. Rptr.2d 42, 906 P.2d 1196, 1204 (1995) (refusing to apply common fund doctrine to hospital-creditor).

■ {25} In addition, we agree with Defendant that allowing injured tort victims to assign the proceeds of their personal injury claims could add unnecessary complications to the settlement of relatively straightforward cases. Assignments are only enforceable if they do not increase the burden on the obligor. *See Herzog*, 594 A.2d at 1108–09; Restatement (Second) of Contracts, § 317(2)(a); 6 Am.Jur.2d *Assignments* § 17 (1999). When an insurer asserts a subrogation interest, the cause of action proceeds in the name of the insured, but the insurer is ordinarily considered an indispensable party. *Amica Mut. Ins. Co.*, 120 N.M. at 527, 903 P.2d at 838. Defendant argues that a similar rule would necessarily apply when a plaintiff assigns the proceeds of a cause of action. The joinder of physicians and other creditors, however, could be considerably more difficult than the joinder of insurance companies, which, for better or for worse, are routinely involved in modern litigation. We think the assignment of the proceeds from personal injury claims would increase the burden on tortfeasors and their insurers in resolving such claims. Conceivably, we could authorize the assignment of personal injury proceeds, but allow defendants to object if a plaintiff's assignment adds unnecessary complications. This, again, would put the

burden on the defendant to address a complication created by the plaintiff. It should be the responsibility of the injured tort victim, however, to disperse funds to creditors.

{26} Finally, the state actively regulates insurance contracts, *see* NMSA 1978, §§ 59A–1–1 to 59A–58–18 (1984, as amended through 2001), and can address problems concerning the enforcement of subrogation rights through its regulatory power. Private contracts between physicians and patients, on the other hand, may be more difficult to regulate. For that reason, we think it best to leave to the legislature the decision as to whether to recognize health care assignments. The legislature could consider the range of potential problems arising from these assignments, and could adopt specific statutory provisions to address those problems before allowing the assignment of proceeds of personal injury claims.

{27} Plaintiff also pointed out that attorneys take a portion of an accident victim's proceeds through contingency fee agreements. Like subrogation, contingency fees are well established in law. They are also regulated through the Rules of Professional Conduct. *See* Rule 16–105(C) NMRA 2002 (governing fees). We do not see the two situations as analogous. The contingency fee compensates the attorney for services rendered. The attorney is not intermeddling in litigation, but is acting as an agent for the client. The physician's fees and services, on the other hand, are unrelated to the litigation itself.

*The Enforcement of Other Agreements to Pay Physicians from Judgment Proceeds*

 {28} Plaintiff's second question recognizes that the law will enforce other arrangements through which a patient promises to pay a physician out of any proceeds from a personal injury claim. First, an attorney who signs a similar agreement is obligated to honor it. *See In re Moore*, 2000–NMSC–019, ¶¶ 4–5, 129 N.M. 217, 4 P.3d 664 (upholding disciplinary action against attorney who refused to honor a "letter of protection" promising to pay physician out of judgment proceeds); *Romero*, 111 N.M. at 790, 810 P.2d at 809 (holding attorney liable for

failing to honor the client's assignment to a physician). Second, the physician can proceed directly against the patient for the amount owed. Of course, the physician then bears the risk that the patient will be judgment proof. If the patient has received the judgment proceeds, however,

> once such damages become liquidated, the tort victim's creditors may proceed against those monies despite the fact that they resulted from a cause of action for personal injuries. And this is true even though the victim might as a result lose his compensation for pain and suffering or diminished future earning power.

*In re Musser*, 24 B.R. at 922. Thus, the law will not shield a patient who makes promises to pay a debt out of the proceeds of a personal injury claim. Why then, would we continue an exception to the general rules of assignment, which merely grants the assignee additional protection in ensuring that its debt is paid?

{29} Attorneys representing personal injury clients commonly issue letters of protection to health care professionals to ensure that clients will receive necessary medical treatment. *In re Moore*, 2000–NMSC–019, ¶ 2 n. 1, 129 N.M. 217, 4 P.3d 664. In *Romero*, our Supreme Court analyzed this arrangement under the principles of assignment law, describing an attorney who has signed an assignment agreement as an "obligor." Other courts perceive the attorney as acting as a "collecting agent" for the client. *State Farm Mut. Ins. Co. v. St. Joseph's Hosp.*, 107 Ariz. 498, 489 P.2d 837, 842 (1971) (en banc). In that view, the courts are not enforcing an assignment, but the direct promise of the attorney and client to pay the health care provider.

 {30} The rule prohibiting the assignment of personal injury claims is well rooted in the common law. There is no analogous rule prohibiting an accident victim from entering into contracts. The law cannot prevent parties from making bad decisions, and the law will enforce disadvantageous contracts. We recognize that assignments are a well-established means for creditors to protect their right to payment. However that

protection has never been available through the assignment of personal injury claims, and we decline to extend that protection now. Clearly, if the courts began enforcing the assignment of personal injury claims, the use of such assignments would increase, because assignments would provide greater security than the injured tort victim's promise alone. We think the best course of action, unless and until the legislature acts, is to maintain the rule prohibiting the assignments of personal injury claims, while enforcing the promises of patients and their attorneys.

{31} We also think there are fewer problems inherent in enforcing an attorney's agreement on behalf of a client. In general, attorneys will issue letters of protection only for necessary services related to the accident. *But see Advance Fin. Co., Inc. v. Trustees of Clients' Sec. Trust Fund,* 337 Md. 195, 652 A.2d 660, 661 (1995) (involving attorneys who referred clients to lender who offered loans in exchange for assignments). In addition, when the victim's attorney handles these creditors, there is no concern about joinder. The tortfeasor writes one check, and it is up to the injured tort victim and the attorney to distribute the funds to the creditors. In addition, the actions of attorneys are regulated through the rules of professional conduct and the disciplinary board. Conceivably, the Supreme Court, in its regulatory role, could prohibit attorneys from issuing letters of protection if the practice became troublesome.

### The Legislature, Not the Courts, Should Address the Assignment of Personal Injury Claims

{32} Given this analysis, we do not accept Plaintiff's proposition that our prior case law would naturally lead to recognition of the assignment of personal injury claims or proceeds thereof. While the *Motto* and *Seaboard Fire & Marine Insurance Co.* courts used broad language addressing the right of assignment in personal injury cases, those cases involved only the rights of subrogation, and we do not read them as addressing the enforceability of assignments. We read those cases as creating an exception to the common law rule prohibiting the assignment of personal injury claims, not as abrogating the rule altogether. Similarly, we do not

read *Romero* as authorizing the enforcement of health care assignments against a tortfeasor, rather than an attorney.

{33} Nor are we convinced that we should enforce the assignment of personal injury claims on public policy grounds. We recognize that Plaintiff was providing a beneficial service. The patient in this case had no insurance, presumably was not eligible for Medicare or Medicaid for Plaintiff's services, and had no ability to pay out of pocket. The tort recovery system may work too slowly in situations like these. The problems associated with the lack of access to health insurance, however, go far beyond the facts of this case. We think the legislature is in the best position to address these problems and devise the most appropriate solutions. Rather than abrogate the common law and allow a practice that could be potentially harmful to accident victims, we leave it to the legislature to consider the competing policy interests and decide whether or how to assist accident victims who have insufficient access to medical care.

### Estoppel

{34} Plaintiff argues that, even if we refuse to recognize the validity of these assignments generally, we should apply the doctrine of estoppel and force Defendant to honor the assignment. Plaintiff points out that Defendant received notice of the assignment twice, and also received billing updates from Plaintiff, but never indicated it did not intend to honor the assignment. We do not agree that estoppel applies here. The elements of estoppel are (1) a false representation or concealment of material facts, (2) knowledge of true facts, and (3) an intention or expectation that an innocent party would rely on those facts. *See Brown v. Taylor,* 120 N.M. 302, 305–06, 901 P.2d 720, 723–24 (1995).

{35} Plaintiff cannot assert that it relied on Defendant's conduct to its detriment. Plaintiff accepted the assignment before providing notice to Defendant, not knowing whether or not Defendant would assert that the assignment was invalid. In addition, we do not construe Defendant's silence upon re-

ceiving notice of the assignment as a false representation that it would honor the assignment, or as a concealment of its position regarding the validity or personal injury assignments. Plaintiff never sought an affirmative assurance that Defendant considered the assignment valid. Plaintiff has not established the elements of estoppel.

## CONCLUSION

{36} We decline to abrogate the common law rule prohibiting the assignment of personal injury claims, and we reject any distinction between an assignment of the proceeds of a claim and an assignment of the claim itself. Therefore, we affirm the judgment of the district court dismissing Plaintiff's claim to enforce its patient's assignment of the proceeds from the claim arising out of his automobile accident.

{37} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and CYNTHIA A. FRY, Judges.