511 P.2d 752

**GULF REFINING COMPANY,**
Plaintiff-Appellee,

v.

**John ETCHEVERRY, Defendant-Appellant.**

No. 932.

Court of Appeals of New Mexico.
May 4, 1973.

Rehearing Denied May 31, 1973.

Certiorari Denied June 28, 1973.

Gary D. Reagan, Glen L. Houston, John T. Porter, Williams, Johnson, Houston, Reagan & Porter, Hobbs, for appellant.

William V. Kastler, Midland, Tex., for appellee.

## OPINION

HERNANDEZ, Judge.

Plaintiff, Gulf Refining Company [hereinafter "Gulf"], owner of a right-of-way across land held under a state grazing lease by defendant Etcheverry [hereinafter "Etcheverry"], applied for a preliminary and permanent injunction in the court below, alleging interference by Etcheverry with Gulf's construction of a pipeline along the right-of-way. Etcheverry counterclaimed on the grounds that Gulf's construction of the pipeline had caused injury to his livestock and to the natural grasses lying over and near the route of the pipeline. The trial court granted the preliminary injunction but denied Gulf's request for the permanent injunction "inasmuch as the Defendant in open court has acknowledged the validity of Plaintiff's right-of-way." Etcheverry's counterclaim for damages for injury to the land and to the livestock was denied because he "failed to prove that any damages were committed by Gulf Refining Company."

Etcheverry appeals the denial of his counterclaim asserting:

(1) that Gulf caused the injury to his livestock and the leasehold by an unreasonable exercise of the easement rights; and

(2) that the judgment must be reversed because his, Etcheverry's, evidence as to damages was uncontradicted and the trial court erred in making findings of fact to the contrary.

We will consider the second claim first because it is dispositive of this appeal. At the outset we would point out that it is not the duty of this court to be concerned with the weight of evidence but rather to determine whether there is substantial evidence to support the trial court's finding that the appellant failed to prove that he was damaged by the actions of appellee. Svejcara v. Whitman, 82 N.M. 739, 487 P.2d 167 (Ct.App.1971). Furthermore, it is our duty to indulge all reasonable inferences in support of the judgment and view the facts in the aspect most favorable to the appellee. Durrett v. Petritsis, 82 N.M. 1, 474 P.2d 487 (1970).

[3] The question of whether a jury or trial court can disregard uncontradicted testimony and if so under what circumstances has been considered many times by the appellate courts of this State. The landmark case is that of Medler v. Henry, 44 N.M. 275, 101 P.2d 398 (1940) wherein the following rule was laid down:

". . . the testimony of a witness, whether interested or disinterested, cannot arbitrarily be disregarded by the trier of the facts; but it cannot be said that the trier of facts has acted arbitrarily in disregarding such testimony, although not directly contradicted, whenever any of the following matters appear from the record:

(a) That the witness is impeached by direct evidence of his lack of veracity or of his bad moral character, or by some other legal method of impeachment.

(b) That the testimony is equivocal or contains inherent improbabilities.

(c) That there are suspicious circumstances surrounding the transaction testified to.

(d) That legitimate inferences may be drawn from the facts and circumstances of the case that contradict or cast reasonable doubt upon the truth or accuracy of the oral testimony."

However, there is another rule of law which is controlling in this situation and that is that a party suing for specific damages has both the burden of proving the existence of injuries and the burden of proving damages with reasonable certainty so that the determination of the amount of damages by a judge or jury will not be based on speculation or conjecture. Fredenburgh v. Allied Van Lines, Inc., 79 N.M. 593, 446 P.2d 868 (1968); Bank of New Mexico v. Rice, 78 N.M. 170, 429 P.2d 368 (1967); Louis Lyster, Gen. Con., Inc. v. Town of Las Vegas, 75 N.M. 427, 405 P.2d 665 (1965).

While we do not propose to outline all of the evidence presented concerning damages, we will point out certain deficiencies which lead us to the conclusion that there is substantial evidence to support the trial court's finding that appellant failed to prove that he was damaged by the actions of appellee.

The right-of-way granted to Gulf was 50 feet in width and 1,684.95 rods in length for the purpose of laying and maintaining a pipeline. The document granting the right-of-way provided in part that Gulf ". . . its successors and assigns, hereby agree carefully to avoid destruction or injury to any improvements or livestock lawfully upon said premises, carefully to close all gates and pay the reasonable and just damages for such injury or destruction, if any, arising from laying, maintaining, operation and removing said pipe line." The entire operation, which was done in the first part of November 1969, digging the excavation, laying the pipe and filling it, took about two weeks. The equipment and

vehicles used in the construction raised a considerable amount of dust which settled in the adjoining pastures. Some debris in the form of rocks and clumps of dirt were left along the right-of-way, after completion, and since then various undesirable grasses and weeds had grown up along the right-of-way. The exact size of the Etcheverry ranch was not brought out but the record does disclose that he leased 12,605.51 acres from the State of New Mexico and that the area within the Gulf right-of-way totaled 32 acres. The record also discloses that the ranch was fenced off into several pastures and that the right-of-way crossed only two of them. On these two pastures there were 140 yearling steers, 39 cows and 400 yearling ewes.

Etcheverry called four witnesses: a photographer who had taken some pictures of the right-of-way; Mr. James Goodrum, a rancher and wool warehouseman; Mr. Howard Benham, a botanist and range ecologist; Dr. L. P. Clark, a doctor of veterinary medicine. Etcheverry also testified in his own behalf. Mr. Goodrum testified that whenever range land is disturbed by digging, such as in this case, that many undesirable weeds and grasses will crop up. Some of these penetrate the wool and cleaning them out costs about 25 cents per pound. The cleaning process damages the wool and reduces the sale price by about one third or about 20 cents per pound. He said, referring to contamination, that Etcheverry had always had an outstanding clip. Mr. Goodrum was asked to compare Etcheverry's 1969 wool clip with those of 1970 and 1971. He said that '70 and '71 showed more foreign matter. However, on cross examination he was asked to compare these two years with those of other ranchers in the area for the same period and he said that the clip was average. Mr. Goodrum indicated he knew how many sheep Etcheverry had, but never testified to that number. Mr. Goodrum was not asked to compare the wool from the 400 yearling ewes with wool from other Etcheverry sheep. Mr. Goodrum testified that he did not know how much per pound Etcheverry

had suffered because of cleaning and reduction in value.

Mr. Benham also testified to the growth of undesirable weeds and grasses after the soil was disturbed and that the way to counteract them was by reseeding with desirable grasses. He said that the cost of reseeding could be as low as two dollars and as high as fifteen dollars per acre. He was not asked how much it would cost to reseed the Etcheverry land, nor was he asked how much of the Etcheverry land had undesirable weeds as a result of laying the pipeline.

Dr. Clark testified that some of the undesirable weeds were highly toxic to animals and that if eaten could make them very sick or even kill them. He also testified that some of these weeds would cause the ewes to abort. However, when questioned specifically about Mr. Etcheverry's sheep he could not remember ever treating any of them for poisoning from eating noxious weeds. He went on to say that some of the Etcheverry sheep had died from eating turpentine weed, but he did not remember when this occurred. He was not asked if any of those that died were part of the 400 yearling ewes. He also testified that sheep were "fright" animals, that they would not readily cross an obstacle such as a shallow ditch and that they would not drink water that had a film of dust on it. It was brought out that he had never personally seen the area in question.

Mr. Etcheverry testified concerning his damages as follows:

". . . I had two pastures that this pipeline crossed, and in one, I had 140 steer yearlings, and 400 yearling ewes, and the other I had 39 grown cows. Okay, I figured I had about a ten percent loss, and in lamb growth, because I did not get a good breeding season . . I figured I had lost some of my lambs, you know, due to poor breeding, and then I figured just a flat $25.00 a head on steers, because of their inability to get to the minerals and water . . . on these 39 cows, these cows at this

time, were carrying calfs, they calf in March, and I figured they affected that because of an undue stress on the cow and the unborn calf, so I figured a flat $30.00 a head for that. And, then I had wool, two years wool clip here in Roswell, consisting of 31,891 pounds of wool, and our base incentive price now is 72 cents . . . and I felt I had a 25% damage of my wool . . . and, the total figure on the livestock, I figured to the 140 steers, 400 ewes, and the coming lamb crop . . . plus the 39 cows . . . I might have aborted a calf or twenty because of this, and I am not sure, no way to tell. A total damage of $8,170.00 . . . Mr. Rodriguez, he spent two or three hours a day making sure that the livestock was getting water, and I lumped all this together and came up with a figure of $11,000.00."

As was stated in Industrial Supply Company v. Goen, 58 N.M. 738, 276 P.2d 509 (1954) "Testimony of this inconclusive sort cannot be substituted for accurate testimony as to damages when the accurate testimony is available." Mr. Etcheverry could have been asked to compare the percentage of calves born to the 39 cows in the affected pasture with those of other cows. He could have had Mr. Goodrum compare the wool clip from the 400 yearling ewes with those of other sheep as to cleanliness. Furthermore it is obvious that those 400 yearling ewes did not produce 31,891 pounds of wool in two years. The exact amount could have been determined. He could have compared the weight of some of the 140 steer yearlings with some other steer yearlings in other pastures. We assume that there was evidence that damage occurred. However, on the basis of the evidence presented, the trial court could properly consider the amount of the damages was so inconclusive as to be speculative and could properly find there was an absence of proof of damages committed by Gulf. Since there was an absence of proof, the uncontradicted evidence rule of Medler v. Henry, supra, is inapplicable.

Having held that the trial judge could properly find that damages were not proved, we do not reach the question of the type of damages recoverable, or the question of the meaning and applicability of Czerner v. Kerby, 53 N.M. 311, 207 P. 2d 531 (1949) and Lea County Water Company v. Reeves, 43 N.M. 221, 89 P.2d 607 (1939).

The judgment of the district court is affirmed.

It is so ordered.

WOOD, C. J., and HENDLEY, J., concur.