2006-NMCA-075

137 P.3d 631

Tanya ESPINOSA, Tina Espinosa,
and Ronnie Espinosa, Jr.,
Plaintiffs–Appellants,

v.

UNITED OF OMAHA LIFE
INSURANCE COMPANY,
Defendant–Appellee,

Mutual of Omaha Structured Settlement
Company (Mossco–CT), and Mutual of
Omaha Companies, Michelle Hope
Romero–Espinosa, Individually and as
Mother and Next Friend of Stephanie
Nichole Romero, Jaqueline Monique
Romero, and Elizabeth Rachel Romero,
Defendants,

and

Settlement Capital Corporation and Set-
tlement Funding Company, LLC, d.b.a.
Peachtree Funding Company, LLC, In-
tervenors–Appellees,

and

In the Matter of the Estate of Ronnie
Gilbert Espinosa, Sr., Deceased.

No. 25,278.

Court of Appeals of New Mexico.

April 24, 2006.

Certiorari Denied, No. 29,800,
June 21, 2006.

Clara Ann Bowler, James K. Gilman, Albuquerque, NM, for Appellants.

M. Clea Gutterson, Albuquerque, NM, for Defendant–Appellee United of Omaha Life Insurance Company.

R. Thomas Dawe, Albuquerque, NM, for Intervenor–Appellee Settlement Funding Company, LLC.

## OPINION

CASTILLO, Judge.

{1} The issue before us is the enforceability of an anti-assignment clause contained in an annuity purchased pursuant to the terms of a structured settlement agreement between an alleged tortfeasor and its tort victim. Because we hold that in this case, the anti-assignment clause is enforceable, we reverse the trial court's orders and remand for further proceedings, as detailed in the conclusion of this opinion.

## I. BACKGROUND

{2} First, we provide a short history of events that occurred before the filing of the complaint in this case. Ronnie Espinosa, Sr., (Mr. Espinosa) was the plaintiff in a medical

malpractice suit. The parties to that lawsuit entered into a structured settlement agreement and release (Structured Settlement Agreement), providing in pertinent part that Mr. Espinosa would receive monthly payments of $1,667.58 "for life with 20 years guaranteed." The Structured Settlement Agreement allowed either the defendants to the tort lawsuit or their insurer through its assignee, Mutual of Omaha, to purchase an annuity from United of Omaha Life Insurance Company (United of Omaha) and further specified that Mutual of Omaha would be the "sole owner of the annuity policy and [would] have all rights of ownership." Pursuant to those terms, Mr. Espinosa and Mutual of Omaha signed a "Qualified Assignment, Release and Pledge Agreement" (Qualified Assignment), which provided for the purchase of an annuity policy from United of Omaha for Mr. Espinosa's benefit. In the Qualified Assignment, Mr. Espinosa agreed that he would have "no right to anticipate, sell, assign, pledge, encumber, or otherwise exercise any right with respect to the Annuity." He also agreed that the annuity policy would contain the following provision:

### Notice

This annuity contract has been delivered to the possession of [Mr.] Espinosa for the sole purpose of perfecting a lien and security interest of such person in this contract. [Mr.] Espinosa is not the owner of, and has no ownership rights [in], this contract and may not anticipate, sell, assign, pledge, encumber, or otherwise use this contract as any form of collateral. Please contact the issuer of this contract for further information.

The annuity policy was issued under Number SU6176399, and the front of the annuity policy was stamped with a modification of the above provision.

{3} The payments to Mr. Espinosa commenced on November 15, 1996. In February 1998, Mr. Espinosa divorced his first wife and subsequently named his children with his first wife as contingent beneficiaries to his annuity policy. These children are Plaintiffs in this case.

{4} In May 1999, Mr. Espinosa married Michelle Hope Romero (Mrs. Espinosa). Mr. Espinosa died on September 1, 2000. After his death, Mrs. Espinosa allegedly sent to United of Omaha a post-dated change of beneficiary form with Mr. Espinosa's purported signature, designating Mrs. Espinosa's children as the new contingent beneficiaries.

{5} Now we come to the facts of this case. As a result of Mrs. Espinosa's actions and in order to establish the proper contingent beneficiaries to the annuity policy, Plaintiffs filed a complaint for declaratory judgment against United of Omaha and against Mrs. Espinosa, individually and as next friend to her three children. Several months after the suit was filed, Settlement Funding Company, LLC, (Settlement Funding), d.b.a. Peachtree Funding Company, LLC, intervened in the action and claimed that Mr. and Mrs. Espinosa had "pledged and collaterally assigned" Mr. Espinosa's rights under the annuity policy to WebBank as security for a loan in the amount of $111,317.00. WebBank later assigned its interest in the loan to Peachtree Funding Company, LLC, a division of Settlement Funding. The loan went into default in October 2000, which prompted Settlement Funding's intervention in the present case.

{6} During the course of the litigation, both Plaintiffs and Settlement Funding filed cross-motions for summary judgment. Relying primarily on contract law and public policy, Plaintiffs argued that according to the terms of the settlement documents, Mr. Espinosa's right to payments under the annuity could not be legally alienated. According to information provided in the affidavits attached to Plaintiffs' motion, (1) the structure of the settlement, which provided for nonassignable annuity payments over a period of time, was entered into for the protection of Mr. Espinosa, who was physically and mentally debilitated as a result of the injuries caused by the alleged malpractice; (2) the value of the annuity policy was $296,829.24 when it was assigned to WebBank, which subsequently assigned its interest to Settlement Funding; and (3) according to the loan documents, Mr. and Mrs. Espinosa borrowed $111,317.00 and granted a security interest in

Mr. Espinosa's right to receive cash payments from the annuity.

{7} In its motion, Settlement Funding contended that Mr. Espinosa's rights under the annuity policy should be considered "payment intangibles," subject to Article 9 of the Uniform Commercial Code (UCC), as amended effective July 1, 2001. NMSA 1978, §§ 55–9–101 to –710 (2001). Arguing that the anti-assignment provision stamped on the face of the annuity policy was unenforceable, Settlement Funding asserted that under the terms of the loan agreement, it was entitled to foreclosure of all the monthly annuity payments owed to Mr. Espinosa. Plaintiffs countered by arguing that the annuity payments retained their identity as a tort settlement and insurance benefits, both of which are excluded from the operation of the UCC. Without making any specific findings with respect to the cross-motions, the trial court granted summary judgment to Settlement Funding and denied summary judgment to Plaintiffs.

{8} Shortly after the summary judgment order was entered, Plaintiffs filed a first amended complaint, alleging a number of tort claims against Settlement Funding and others. Settlement Funding filed a motion for default judgment of foreclosure and a motion to dismiss the tort claims against it. The trial court granted the motion to dismiss all claims against Settlement Funding and entered an order of foreclosure as to the annuity policy in favor of Settlement Funding. This is Plaintiffs' appeal of the final order adjudicating all issues with regard to Settlement Funding. For the reasons discussed in this opinion, we reverse the trial court's summary judgment order and final order, and we remand for further proceedings.

## II. DISCUSSION

### A. Standard of Review

{9} The basis for the final order was the trial court's summary judgment order. Accordingly, we evaluate the trial court's determination in this regard. Summary judgment is appropriate where there are no genuine issues of material fact and where the party seeking summary judgment is entitled to judgment as a matter of law. Rule 1–056(C) NMRA. We review the grant of summary judgment de novo, and we construe all reasonable inferences in favor of the nonmoving party. *See Katcher v. Johnson Controls World Servs., Inc.,* 2003–NMCA–105, ¶ 10, 134 N.M. 277, 75 P.3d 877.

### B. Choice of Law

{10} As discussed above, Mr. Espinosa signed the Structured Settlement Agreement and the Qualified Assignment, both of which related to his tort injuries. The Qualified Assignment contains a provision titled "Governing Law," which states that the Qualified Assignment "shall be governed by and interpreted in accordance with the laws of the State of Nebraska."

{11} Below, Settlement Funding argued that the law of New Mexico, not Nebraska, should apply in this case. Although Plaintiffs mentioned Nebraska law in their pleadings by pointing out that Nebraska has "enacted special legislation enforcing anti-assignment language in structured settlements," Plaintiffs relied on New Mexico's UCC in support of their arguments. On appeal, the parties do not argue that we must apply Nebraska law in this case; instead, they rely exclusively on New Mexico's UCC in making their arguments. Choice of law questions must be adequately raised below, or they are waived. *See Gonzales v. Surgidev Corp.,* 120 N.M. 133, 140, 899 P.2d 576, 583 (1995) (deciding not to consider a choice of law preemption claim because the issue was not properly raised at trial and was therefore waived); *Fredenburgh v. Allied Van Lines, Inc.,* 79 N.M. 593, 595–96, 446 P.2d 868, 870–71 (1968) (restating the rule that an affirmative defense must be pleaded or it is waived and cannot be argued on appeal); *see also Strickland Tower Maint., Inc. v. AT & T Commc'ns, Inc.,* 128 F.3d 1422, 1426 (10th Cir.1997) (determining that where the trial court applied the law of Oklahoma and the parties did not challenge that finding on appeal, the appellate court would accept the trial court's view that the law of Oklahoma applies). In this case, we apply New Mexico law.

## C. New Mexico Uniform Commercial Code

### 1. Applicability of Pre–July 2001 Version of Article 9

█ {12} In addressing the parties' arguments, we must first determine which version of Article 9 applies. Article 9 was amended effective July 1, 2001. Section 55–9–701. Plaintiffs argue that the 2001 amendments to Article 9 of the UCC are not applicable to this case because the case was commenced in December 2000. *See* § 55–9–702(c) ("This act does not affect an action, case or proceeding commenced before July 1, 2001."). Settlement Funding does not dispute Plaintiffs' argument. Instead, it contends that under either the previous version or the amended version of Article 9, Settlement Funding is entitled to judgment as a matter of law. Because the case was already pending on the effective date of the amendments to Article 9 of the UCC, we hold that the previous version of Article 9, prior to the July 2001 amendment, is applicable to this case. *See, e.g., Cmty. Pub. Serv. Co. v. N.M. Pub. Serv. Comm'n,* 99 N.M. 493, 497, 660 P.2d 583, 587 (1983) (holding that the effective statute is that which was in effect at the time events in the case occurred); *USLife Title Ins. Co. of Dallas v. Romero,* 98 N.M. 699, 703, 652 P.2d 249, 253 (Ct.App.1982) (holding that where a case is pending when an amended statute is enacted, the prior statute applies to the case). Unless specifically noted otherwise, our references to Article 9 will refer to the version of Article 9 before the July 2001 amendment. Because some of the arguments rely on the 2001 version and official comments thereto, we will insert the adoption date of a statute when it appears that there may be confusion. A 2001 adoption date will indicate the 2001 version, while an adoption date earlier than 2001 will indicate the pre-amendment version.

{13} Article 9 of the UCC applies generally to secured transactions. Transactions excluded from Article 9 include the "transfer of an interest in or claim in or under any policy of insurance" and the "transfer in whole or in part of any claim arising out of tort." *See* NMSA 1978, § 55–9–104(g), (k) (1997). Be-

low, Plaintiffs relied on both (g) and (k). On appeal, Plaintiffs continue to maintain that the payments to Mr. Espinosa qualify under both and are therefore not covered by the UCC. In response, Settlement Funding argues that the payments cannot be categorized as either and are therefore governed by the UCC.

{14} Settlement Funding points us to NMSA 1978, § 55–9–318(4) (1985), which contains language that invalidates certain types of anti-assignment clauses. Arguing that the right to receive payments under an annuity is considered a general intangible under NMSA 1978, § 55–9–106 (1997), and that Section 55–9–318(4) applies to the "creation of a security interest in a general intangible for money due or to become due," Settlement Funding maintains that the anti-assignment clause in the annuity is invalid because the transaction at issue here is one in which Settlement Funding took a security interest in a general intangible. Plaintiffs, on the other hand, contend that no part of Article 9 applies to the transaction involved in this case. The official comment to Section 55–9–106 (1997) refers to the definition of a general intangible as a "catchall definition" and notes that it does not apply to types of intangibles that are specifically excluded under Section 55–9–104 (1997). Accordingly, if this transaction is excluded from Article 9 coverage, Settlement Funding's argument fails. Therefore, we first focus our discussion on whether the payments qualify as "arising out of tort," under Section 55–9–104(k), and then on whether the payments are considered a "claim in or under any policy of insurance," as set forth in Section 55–9–104(g).

### 2. Tort Claim Exception Under Pre–July 2001 Version of Article 9

█ {15} Initially, we note that Settlement Funding contends that the Structured Settlement Agreement and the Qualified Assignment should be considered separately from the annuity policy because it is from the Structured Settlement Agreement and Qualified Assignment that Mr. Espinosa's rights flow and because he was not a party to the annuity policy. We disagree. "If two or

more writings are part of a single transaction and concern the same subject matter, then they are a single contract." *Crow v. Capitol Bankers Life Ins. Co.*, 119 N.M. 452, 456, 891 P.2d 1206, 1210 (1995). To determine whether two or more writings amount to a single contract, we look at the surrounding circumstances and the intentions of the parties. *Id.* at 456–57, 891 P.2d at 1210–11. "A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." Restatement (Second) of Contracts § 202(2) (1981); *see also CGU Life Ins. Co. of Am. v. Metro. Mortgage & Sec. Co.*, 131 F.Supp.2d 670, 675 (E.D.Pa.2001) (applying general rules of contract: two or more documents executed at the same time and involving the same transaction are construed as a whole, even when different parties are involved, and two or more agreements made as part of the same transaction, though made at different times, are construed as a whole); *Crow*, 119 N.M. at 457, 891 P.2d at 1211. Here, the parties to the underlying tort action entered into a Structured Settlement Agreement, which included an agreement to make a Qualified Assignment and an agreement to purchase an annuity. The Qualified Assignment, stamped on October 10, 1996, refers to the Structured Settlement Agreement and to the annuity to be purchased. The annuity policy was issued on October 10, 1996, the same date stamped on the Qualified Assignment. It becomes clear that the Qualified Assignment and the annuity policy were intended to be part of the same transaction. Based on the circumstances, the Structured Settlement Agreement, Qualified Assignment, and annuity are all part of the same agreement between Mr. Espinosa and the tortfeasor; thus, they are to be read together. Specifically, Mr. Espinosa's agreement in the Qualified Assignment—that the annuity policy would not be assignable and would contain express non-assignability language—makes the non-assignability provision of the annuity applicable to Mr. Espinosa. We therefore do not agree with Settlement Funding's argument that Mr. Espinosa was not bound by that provision, since he was not a signatory party to the annuity policy. The bottom line is that Mr. Espinosa agreed not to assign his right to receive payments under the annuity, whether or not he was an owner of or a party to the annuity. It is the enforceability of this agreement that is in question in this case.

{16} Plaintiffs' argument is that the payment stream originating from the Structured Settlement constitutes tort compensation and is thus exempted from Article 9 of the UCC. We are aware that courts are split on the question of whether proceeds from a tort settlement qualify as "arising out of tort" under the UCC. *See* § 55–9–104(k); *see, e.g., Owen v. CNA Ins./Cont'l Cas. Co.*, 167 N.J. 450, 771 A.2d 1208, 1211–12 (2001) (discussing the controversy surrounding whether the Article 9 exclusion applies to proceeds of tort claims); *Barclays Bus. Credit, Inc. v. Four Winds Plaza P'ship*, 938 F.Supp. 304, 308–09 (V.I.1996) (listing arguments on both sides of the issue of whether tort proceeds are excluded from Article 9); *see also* Gregory Scott Crespi, *Selling Structured Settlements: The Uncertain Effect of Anti-Assignment Clauses*, 28 Pepp. L.Rev. 787, 792–93 (2001) (explaining those cases in which "courts that have explicitly addressed the Article 9 question have uniformly found it to be inapplicable, although their rationales vary"); John Krahmer, *Anti-Assignment Clauses and Structured Settlements Under Revised Article 9*, 56 Consumer Fin. L.Q. Rep. 25, 31–32 (2002) (discussing the considerable litigation regarding the validity of the sale of the right to future payments under structured settlements with non-assignment clauses); Adam F. Scales, *Against Settlement Factoring? The Market in Tort Claims Has Arrived*, 4 Wis. L.Rev. 858, 939–40 (2002) (reviewing the effect of the exclusions under Article 9 on the controversy about the factoring of proceeds from structured settlements). After reviewing various decisions from other jurisdictions, we are convinced that the better-reasoned view in this case is that under Article 9, the annuity payments flowing from the Structured Settlement Agreement are payments "arising out of tort" and are therefore excluded from Article 9 of the UCC. *See* § 55–9–104(k).

{17} As discussed in *Barclays*, there is no majority rule among other jurisdictions as to whether the exclusion of transfers of tort

claims under Section 55–9–104(k) also excludes tort settlement proceeds. *Barclays,* 938 F.Supp. at 308. The court in *Barclays* cited to numerous authorities that provide some history about the exclusion contained in Section 55–9–104(k), as well as its interpretation, and specifically whether this section of Article 9 also excludes derivative settlement rights from tort claims. *Barclays,* 938 F.Supp. at 308–10. Having reviewed these authorities, we believe that an interpretation that would allow tort settlement proceeds to be assigned under Article 9 seems to cut against the apparent intent of the drafters of Section 55–9–104(k). We also believe that if Section 55–9–104(k), with its accompanying official comment, is interpreted to exclude certain rights derived from a tort cause of action, the UCC's exclusion of "any claim arising out of tort" would become meaningless, due to the ease with which it could be circumvented by assignment of the derivative rights. *See id.* Over the years, this position has evolved, and now the assignability of tort claims and their proceeds is more favored. Under the 2001 amendment to the New Mexico UCC, revised Article 9 now covers commercial tort claims, and they can be assigned. *See* NMSA 1978, § 55–9–109(d)(12) (2001); § 55–9–109 official cmt. 15. And as we explain in paragraphs 18–20, while the revised Article 9 now appears to cover tort claim proceeds, pre-amendment Article 9 does not.

{18} In this case, Mr. Espinosa settled his tort claim and received in exchange a specific sum of money. He did not receive this money directly; rather, an annuity policy was purchased for the purpose of distributing to him the money that he had received for the settlement of his tort claim. Applying the *Barclays* reasoning to this case, we reach the logical conclusion that the money to be distributed to Mr. Espinosa under the annuity arises out of tort. This money constitutes the proceeds from the settlement of his claim. It makes no sense to exempt from Article 9 any "transfer in whole or in part of any claim arising out of tort" while, at the same time, requiring the proceeds from tort claims to be freely assignable under that same Article. *See* § 55–9–104(k); *Barclays,* 938 F.Supp. at 309 (observing that if Article 9 is construed to apply to rights connected to a tort action, such as structured settlement tort proceeds, the specific exclusion for a claim arising out of tort would be rendered meaningless).

{19} We also look to New Mexico law. In *Quality Chiropractic v. Farmers Insurance Co. of Arizona,* 2002–NMCA–080, 132 N.M. 518, 51 P.3d 1172, this Court upheld the common law rule prohibiting the assignment of personal injury claims and also rejected "any distinction between an assignment of the proceeds of a claim and an assignment of the claim itself." *Id.* ¶ 36. While we agree that *Quality Chiropractic* is a variation on the theme, in that it deals with an assignment to future proceeds, we believe that the reasoning supports our determination that the phrase "claim arising out of tort" would also include the proceeds of that tort. *See* § 55–9–104(k). In *Quality Chiropractic,* this Court reviewed the history of the policy underlying the common law prohibition and addressed the several public policy and equitable arguments made by the assignee. 2002–NMCA–080, ¶¶ 13–31, 132 N.M. 518, 51 P.3d 1172. In upholding the prohibition of assignment of personal injury claims and their proceeds, we recognized the competing policy interests and concluded that the legislature is in the best position to address problems that are created by not allowing the assignment. *Id.* ¶ 33.

{20} Although it appears the legislature has not directly addressed the issue regarding assignment of future proceeds of a tort claim, the legislature did clarify the characterization of the proceeds of a structured settlement in the 2001 amendment to Article 9. According to official comment 15 to Section 55–9–109, "once a claim arising in tort has been settled and reduced to a contractual obligation to pay, the right to payment becomes a payment intangible and ceases to be a claim arising in tort." The concept of payment intangible is also a 2001 addition to Article 9. Official comment 2 to NMSA 1978, § 55–9–318 (2001), states that "sales of payment intangibles [are] transactions that were not covered by former [A]rticle 9." These comments support a conclusion that we would likely treat this transaction differently under the 2001 amendments to [A]rticle 9.

This case, however, is decided under the pre-amendment version of Article 9.

{21} As we explained before, Settlement Funding argues that even under the unrevised Article 9, specifically Section 55-9-106, the payments due Espinosa are general intangibles, to which Section 55-9-318(4) (1985) applies, and that Settlement Funding was therefore legally entitled to take a security interest in the contract payment. We disagree with this conclusion. If an intangible is excluded under Section 55-9-104 (1997), it is not considered a general intangible under Section 55-9-106 (1997). *See id.* official cmt. We have determined that the payment is a result of the tort claim and represents the proceeds of the settlement of that claim. As such, the payment is not covered by Article 9.

{22} Furthermore, construing the exclusion in this manner comports with public policy considerations. There is a strong public policy against allowing factoring companies, such as Settlement Funding, to engage in unrestricted transactions whereby injured individuals, such as Mr. Espinosa, assign their rights to a stream of payments in exchange for a discounted lump-sum payment, particularly in cases where a clear anti-assignment clause is included for the protection of the individual in both a structured settlement agreement and an annuity policy. *See Grieve v. Gen. Am. Life Ins. Co.,* 58 F.Supp.2d 319, 324 (D.Vt.1999). In recognition of that policy, a number of states have enacted legislation to evaluate these transactions before assignment can take place, by requiring judicial or administrative approval before structured settlement rights can be transferred. *See, e.g., In re Goins,* No. 00-61087, 2002 Bankr.LEXIS 1736, at **36-37 (Bankr.E.D.Ky. Dec. 19, 2002). Significantly, New Mexico has also indicated its support of the public policy discussed above by enacting its own legislation, effective July 1, 2005, which requires transfers of structured settlement rights to be approved in advance by a "final court," based on specific findings by the court regarding such matters as the best interests of the recipient, professional advice to the recipient, and the effect of any orders or statutes on the transfer. *See* Structured

Settlement Protection Act (the Act), NMSA 1978, §§ 39-1A-1 to -7 (2005). We agree with Settlement Funding that the Act does not apply to this case. *See* § 39-1A-7(E) (stating that nothing in the Act shall be used to imply that any transfer entered into before July 1, 2005, is valid or invalid). However, the public policy behind the legislation is not new. The public policy in favor of enhancing the likelihood that accident victims will not use the proceeds from their settlements so quickly that they will be unable to support themselves is found in our workers' compensation statutes. *See, e.g., Jackson v. K & M Constr.,* 2004-NMCA-082, ¶ 10, 136 N.M. 94, 94 P.3d 837 (discussing public policy for evaluation of lump sum distributions to injured workers: balancing "the public policy of this state that ... compensation shall be made in a certain amount, to secure the injured employee against want, and to avoid his becoming a public charge" and "the economic difficulties faced by workers who cannot pay debts because of injury or disability" (internal quotation marks and citation omitted)). *See generally In re Kaufman,* 2001 OK 88, n. 40, 37 P.3d 845, 853 n. 40.

{23} For the above reasons, we hold that the exclusion for the transfer "in whole or in part of any claim arising out of tort" applies to the situation in this case. *See* § 55-9-104(k). Article 9 of the UCC therefore has no effect on the anti-assignment provision included in the Structured Settlement Agreement and the annuity policy.

{24} Settlement Funding points to official comment 15 under the amended version of Section 55-9-109 as support for the assertion that once the tort claim was settled by Mr. Espinosa, his right to payment ceased "to be a claim arising in tort." *See* § 55-9-109 official cmt. 15. We agree that this comment appears to differentiate between a tort claim that has been settled and reduced to a contractual obligation and the original tort claim itself. But as we explained above, the 2001 amendment to Article 9 post-dates the assignment by Mr. and Mrs. Espinosa to Settlement Funding, and the amended Article 9 is not applicable to this case. We now turn to the exception regarding insurance policies under Section 55-9-104(g).

### 3. Interest In or Claim In or Under Any Policy of Insurance

■ {25} As noted above, Plaintiffs also claim that the payments to Mr. Espinosa are a transfer of interest under a policy of insurance and are therefore exempted from Article 9 of the UCC. *See* § 55-9-104(g). Settlement Funding contends that the annuity contract is merely a funding mechanism—a contract between the settlement obligor and the annuity contract issuer—and that Mr. Espinosa is not a party to the annuity contract. We address this issue as further support for reversal of the trial court's decision. Courts from other jurisdictions have applied the insurance-policy exemption to annuities related to structured settlements. *See, e.g., CGU*, 131 F.Supp.2d at 677 (holding that although annuities differ from life insurance policies, the statutes governing insurance include annuity contracts under the authority and jurisdiction of the insurance department); *Grieve*, 58 F.Supp.2d at 323–24 (relying on the fact that annuity contracts are included in the statutes governing and regulating insurance to hold that annuity is exempt under Article 9). As in *CGU* and *Grieve*, annuities are also included under and regulated by our New Mexico Insurance Code. *See generally* NMSA 1978, §§ 59A-20-2, -17 to -24 (1984). Also, under the common law, annuities are considered insurance policies for some purposes. *See Black's Law Dictionary* 99 (8th ed.2004) (defining "annuity policy" as "[a]n insurance policy providing for ... periodic payments ... to begin at a fixed date and continue through the insured's life"). We agree with the courts in *CGU* and *Grieve* and hold that payments made pursuant to annuity policies, such as the one in this case, are exempt from Article 9 of the UCC. Accordingly, Settlement Funding's argument that Article 9 applies in this case is without merit.

### D. Contract Law

■ {26} As explained above, Article 9 does not preclude enforcement of the anti-assignment clauses contained in the Qualified Assignment and the annuity policy. We must therefore determine whether the clauses are enforceable under traditional contract law. The parties do not argue that the documents are ambiguous. When a contract or agreement is unambiguous, we interpret the meaning of the document and the intent of the parties according to the clear language of the document, and we enforce the contract or agreement as written. *See, e.g., Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 11, 129 N.M. 698, 12 P.3d 960. As discussed above, both the Qualified Assignment and the annuity policy contain the anti-assignment provision agreed upon by the parties involved in the tort settlement.

■ {27} We are aware that anti-assignment clauses are generally disfavored, but they are enforced in those situations where the language or circumstances indicate a clear intention to prohibit assignment. *See* Restatement (Second) of Contracts § 322(2), at 32 (1981) (disallowing contract terms that prohibit assignment, unless a "different intention is manifested"); *see also* Restatement (Second) of Contracts § 317(2)(c), at 15 (1981) (providing that a contractual right can be assigned, unless the "assignment is validly precluded by contract"). Here, the anti-assignment language that was agreed to and specifically included in both the Qualified Assignment and the annuity policy establishes the clear intention that the payments to Mr. Espinosa were not to be assigned or used as collateral. The language is clear on its face. *Cf. Liberty Life Assurance Co. of Boston v. Stone St. Capital, Inc.*, 93 F.Supp.2d 630, 637 (D.Md.2000) (noting that although the anti-assignment clause did not contain specific language voiding or invalidating any assignment that might be made, the language of the clause clearly denies a party the power to assign the periodic payments); *J.G. Wentworth S.S.C. Ltd. P'ship v. Callahan*, 2002 WI App 183, ¶ 15, 256 Wis.2d 807, 649 N.W.2d 694 (refusing to require " 'magic' words" or a "secret code" to enforce an anti-assignment provision when the language, on its face, showed the parties' clear intention). Based on the clear and unambiguous language in the anti-assignment clause, we hold that the anti-assignment clause is enforceable as written; the assignment to Settlement Funding is therefore void.

700

### E. Equitable Estoppel

{28} Settlement Funding contends that principles of equitable estoppel should apply in this case to prevent the voiding of the assignment by Mr. Espinosa. Equitable estoppel requires "(1) a false representation or concealment of material facts, (2) knowledge of true facts, and (3) an intention or expectation that an innocent party would rely on those facts." *Quality Chiropractic*, 2002–NMCA–080, ¶ 34, 132 N.M. 518, 51 P.3d 1172 (citing *Brown v. Taylor*, 120 N.M. 302, 305–06, 901 P.2d 720, 723–24 (1995)). Here, the elements of equitable estoppel are not met. It is undisputed that there was nothing hidden with regard to the anti-assignment provision stamped on the annuity; thus, Settlement Funding could not have relied to its detriment on the lack of such a provision. The provision clearly and specifically provided that Mr. Espinosa was not the owner of the annuity policy and could not "anticipate, sell, assign, pledge, encumber, or otherwise use [the] contract as any form of collateral." The loan documents prepared by Settlement Funding indicate that Settlement Funding made efforts to circumvent the language of the anti-assignment clause. For example, under the loan documents, Mr. Espinosa was required to acknowledge that under the applicable state law, there may be a problem with the ability to assign the annuity policy, to conduct his affairs in order to prevent the assertion of a claim that the annuity policy was not assignable, and to defend and indemnify Settlement Funding for any claims with respect to the annuity policy. This is not a situation where Settlement Funding, acting as an innocent party and ignorant of the true facts, has relied on the conduct or statements of Mr. Espinosa. Equitable estoppel does not apply.

### F. Court Registry

{29} Plaintiffs claim that this Court should "provide some guidance on the proper use of the District Court Registry." Plaintiffs argue that the trial court abused its discretion in ordering its court clerk to "collect and process future payments to Settlement Funding." Because we are reversing the trial court's summary judgment order and, consequently, the court's order of dismissal and order allowing foreclosure, we need not address this issue.

### III. CONCLUSION

{30} We reverse the trial court's orders granting summary judgment to Settlement Funding, dismissing Plaintiffs' first amended complaint as to Settlement Funding, and entering judgment of foreclosure in favor of Settlement Funding. We remand to the trial court for entry of summary judgment in favor of Plaintiffs on the issue of the enforceability of the anti-assignment provision in the annuity policy and for further proceedings.

{31} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and LYNN PICKARD, Judges.