2008-NMCA-043

180 P.3d 1183

**SMITH & MARRS, INC.,**
Plaintiff–Appellant,

v.

**Clay OSBORN and Jeri Osborn,**
Defendants–Appellees.

No. 26,978.

Court of Appeals of New Mexico.

Feb. 14, 2008.

Maddox, Holloman & Kirksey, P.C., Lee A. Kirksey, Hobbs, NM, for Appellant.

Sanders, Bruin, Coll & Worley, P.A., Kelly Mack Cassels, Roswell, NM, for Appellees.

## OPINION

WECHSLER, Judge.

{1} In this appeal, we consider the right of surface owners Defendants Clay and Jeri Osborn to equitable compensation resulting from oil, gas, and mineral lessee Plaintiff Smith and Marrs, Inc.'s state-mandated obligation to drill and oversee monitoring wells on Defendants' land. We conclude that (1) the leases at issue do not include express language that permits Plaintiff to drill and oversee monitoring wells without consequence, (2) the implied easements by necessity included in the leases at issue do not create any right that permits Plaintiff to drill and oversee monitoring wells without consequence, and (3) the district court had the authority to fashion an equitable remedy to compensate Defendants for Plaintiff's drilling and oversight of monitoring wells and did not abuse its discretion in ordering an annual access fee. Accordingly, we affirm the district court's judgment.

## FACTUAL BACKGROUND

{2} Defendants are the surface owners of real property located in Lea County that is subject to two separate oil, gas, and mineral leases that were executed in the 1940s by the prior owner of the estate. The first lease,

the "Cleveland Lease," was executed in 1944 and covers approximately 560 acres. The second lease, the "Gulf Lease," was executed in 1947 and covers approximately eighty acres. The land included in both leases makes up part of the South Langlie Jal Unit (the Unit), which Plaintiff currently operates.

{3} Prior to September 2000, Bristol Resources Corporation (Bristol) operated the Unit. In January 1999, the Oil Conservation Division of the New Mexico Energy, Minerals and Natural Resources Department (OCD) commenced an investigation regarding the soil and groundwater within the Unit. OCD's investigations indicated that Defendants' "private drinking water well and monitor wells on the [Unit were] contaminated with chlorides and total dissolved solids in excess of New Mexico Water Quality Control Commission standards." The investigations also indicated that there were additional sources of contamination located upgradient from the wells.

{4} In August 2000, in reaction to its findings, OCD required Bristol to submit an abatement plan designed to facilitate the investigation and reduction of the groundwater pollution at issue. The following month, Chaparral Oil, LLC and CEI Bristol Acquisition, LP (Chaparral) purchased Bristol's assets at a bankruptcy auction and subsequently assumed operation of the Unit. In October 2000, OCD notified Chaparral that it would be responsible for filing the abatement plan that it had ordered Bristol to submit. Chaparral eventually submitted an appropriate abatement plan proposal, which OCD approved in April 2002. In November 2002, Chaparral notified OCD that Plaintiff, a Texas corporation that owns and operates oil and gas properties in New Mexico, had become the operator of the Unit, which had been sold to an entity related to Plaintiff.

{5} In January 2003, OCD issued a notice of violation to Plaintiff based on Plaintiff's alleged failure to comply with the administrative rules applicable to the abatement plan. In that notice, OCD required Plaintiff to file an investigative report by February 2003. Plaintiff did not timely file an investigative report, and in March 2003, OCD filed an administrative application, seeking a compli-

ance order. Plaintiff and OCD were eventually able to negotiate a settlement, which was finalized in a written settlement agreement completed in November 2003. The agreement obligated Plaintiff to, among other things, (1) file an investigative report within ninety days of the execution of the agreement; (2) "make a good faith effort to negotiate an access agreement with [Defendants] as necessary for implementation of the Stage 1 Abatement Plan"; and (3) if negotiations failed, "institute[ ] legal proceedings to secure an injunction authorizing such access for the purpose of performing the Stage 1 Abatement Plan."

{6} Plaintiff failed to file an investigative report within ninety days of the execution of the agreement, and its negotiations with Defendants to gain access to their property failed. In July 2004, OCD notified Plaintiff by certified letter that it would seek to obtain a compliance order to enforce the settlement agreement.

## PROCEDURAL BACKGROUND

{7} Plaintiff began this case in August 2004 by filing a petition in the district court for a permanent injunction against Defendants. In its petition, Plaintiff claimed that it had attempted to negotiate in good faith with Defendants and that it was entitled to enter their property, as the operator of the Unit, in order to commence the abatement plan, as agreed in its settlement agreement with OCD.

{8} At the hearing on the petition, Defendants argued that Plaintiff was not entitled to enter their property under the controlling leases. Defendants noted, however, that Plaintiff was seeking an equitable remedy and that they were willing to permit access, provided that they were adequately compensated. Defendants referred the district court to the fact that the State of New Mexico charges an annual fee of $500 per well when an entity is forced to enter state land in order to drill monitoring wells. Defendants' argument followed that such an amount was a small sum in contrast to the $197,000 civil fine that had been imposed by OCD on Plaintiff for its failure to timely implement the abatement plan.

{9} At a subsequent hearing, the district court ruled in favor of Defendants in determining that the controlling leases did not expressly provide Plaintiff with a right to access their property in order to drill and oversee monitoring wells. The district court also found that, by virtue of OCD's intervention to abate groundwater contamination, Plaintiff's use of the surface estate had not been reasonable; therefore, the necessity of drilling monitoring wells could not have been impliedly included in the lease language. However, even though the district court determined that Plaintiff did not have a contractual right to enter the property, in balancing the equities and in light of the maxim that "he who seeks equity must do equity," the district court entered a judgment granting the petition for a permanent injunction but requiring Plaintiff to pay an annual fee of $500 per well to Defendants for each of the six wells at issue. Plaintiff appeals from those rulings.

## EXPRESS LEASE LANGUAGE

{10} We first address Plaintiff's argument that the express language of the leases at issue in this case permits Plaintiff to enter Defendants' land, drill monitoring wells, and periodically return to oversee the wells. Our appellate courts have long maintained that oil and gas leases are to be interpreted on appeal under the same rules as other contracts. *E.g., Leonard v. Barnes,* 75 N.M. 331, 345, 404 P.2d 292, 302 (1965) ("An oil and gas lease is merely a contract between the parties and is to be tested by the same rules as any other contract."). We "review a district court's interpretation of an unambiguous contract de novo" and effectuate the intent of the parties by adopting a "reasonable construction of the usual and customary meaning of the contract language." *H–B–S P'ship v. Aircoa Hospitality Servs., Inc.,* 2005–NMCA–068, ¶ 19, 137 N.M. 626, 114 P.3d 306. Against this backdrop, we examine the leases at issue in the present case to determine if their terms expressly provide for Plaintiff s implementation of the abatement plan. If they do, we will look to the language of the leases to guide the parties' interests. If they do not, we will look beyond the leases to the equitable power exercised by the district court.

{11} The applicable provisions on which Plaintiff respectively relies in the Cleveland Lease and the Gulf Lease include slightly different language. The Cleveland Lease grants Plaintiff rights to the land "for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport and own said products." The Gulf Lease grants Plaintiff rights to the land "for the sole and only purpose of mining and operating for oil and gas, and laying pipe lines, and building tanks, powers, stations and structures thereon to produce, save and take care of said products." Plaintiff argues that those provisions create in it the right to drill and oversee monitoring wells on Defendants' land.

{12} On appeal, Plaintiff urges us to adopt a broad reading of the terms "take care of" and "save." Under such a reading, the activities relating to the abatement plan would be part of the larger oil and gas production effort because Plaintiff could be considered to be "tak[ing] care of" or "sav[ing]" any byproduct produced in the operation. However, applying a reasonable construction to the plain language of the leases, we disagree. Plaintiff's argument ignores the fact that the "save" and "take care of" clauses in both leases relate exclusively to "said products," meaning oil, gas, and/or minerals. *See Nearburg v. Yates Petroleum Corp.,* 1997–NMCA–069, ¶ 12, 123 N.M. 526, 943 P.2d 560 (declining to adopt a party's "strained interpretation" of a provision of an oil and gas lease). This language does not specifically authorize Plaintiff to "save" or "take care of" any surface or groundwater resources, and we will not read such an authorization into the unambiguous meaning of the language of the leases. *See Espinosa v. United of Omaha Life Ins. Co.,* 2006–NMCA–075, ¶ 26, 139 N.M. 691, 137 P.3d 631 ("When a contract or agreement is unambiguous, we interpret the meaning of the document and the intent of the parties according to the clear language of the document, and we enforce the contract or

agreement as written."), *cert. denied,* 2006–NMCERT–006, 140 N.M. 225, 141 P.3d 1279.

■ {13} Plaintiff also relies on the following language in the Gulf Lease to support its argument:

> Compliance with any now or hereafter existing act, bill or statute purporting to be enacted by any Federal or State legislative authority, or with orders, judgments, decrees, rules, regulations made or promulgated by State or Federal courts, State or Federal offices, boards, commissions or committees purporting to be made under authority of any such act, bill or statute, shall not ... become the basis of any action for damages.

Based on that language, Plaintiff asserts that Defendants are contractually barred from receiving any compensation related to any action taken in accordance with its settlement agreement with OCD.

{14} As previously noted, the language referenced above only appears in the Gulf Lease, which applies to a mere fraction of the total acreage of the leased land at issue. As Defendants assert on appeal, Plaintiff has failed to reference any portion of the record that indicates that any of the six wells is located on the eighty acres covered by the Gulf Lease, as opposed to the 560 acres covered by the Cleveland Lease. Our independent review of the record did not reveal any information regarding the locations of the wells. Accordingly, we must indulge every presumption "in favor of the correctness and regularity of the trial court's decision." *Reeves v. Wimberly,* 107 N.M. 231, 236, 755 P.2d 75, 80 (Ct.App.1988). Plaintiff failed to meet its burden to "bring up a record sufficient for review" of this issue, and, as a result, if there is any support for its argument, it is not now before this Court. *Id.*

■ {15} Even if we were to reach the merits of Plaintiff's argument with respect to this issue, our result would be the same. The access fee that the district court awarded to Defendants is not based on an "action for damages" as is contemplated by the language in the Gulf Lease. It was Plaintiff that initiated the lawsuit in this case in order to comply with the terms of the settlement agreement that it entered with OCD, and the access fee that the district court awarded to Defendants is not based on a breach of contract claim or on any damage caused to the surface estate. Rather, the access fee is one component of the equitable solution that the district court, within its discretion, tailored in an attempt to reach a fair result. *See Jones v. Schoellkopf* 2005–NMCA–124, ¶ 23, 138 N.M. 477, 122 P.3d 844 (explaining that a district court has "broad powers" in fashioning an equitable remedy, provided that it "protect[s] the rights of all parties"). Accordingly, the plain language of the Gulf Lease, which protects Plaintiff from having to defend lawsuits that stem from actions taken by state entities and seek money damages, does not serve to bar the district court from exercising its equitable authority in the present case.

## IMPLIED EASEMENT BY NECESSITY

■ {16} We next address Plaintiff's argument that even if it is not expressly permitted to do so under the plain language of the leases at issue in this case, the leases create an implied right to enter Defendants' land, drill monitoring wells, and periodically return to oversee the wells. Plaintiff contends that OCD's demand that it drill monitoring wells was incidental to the underlying purpose of the leases, and therefore, abiding by that demand constitutes a reasonable and necessary use of the surface estate under the lease agreements. Accordingly, Plaintiff challenges the district court's legal conclusion to the contrary. We conduct a review of such an issue de novo. *See Jicarilla Apache Nation v. Rodarte,* 2004–NMSC–035, ¶ 24, 136 N.M. 630, 103 P.3d 554.

■ {17} Plaintiff's argument focuses on the long-standing rule that our Supreme Court expressed in *Amoco Production Co. v. Carter Farms Co.,* 103 N.M. 117, 119, 703 P.2d 894, 896 (1985), that a mineral lessee "is entitled to use as much of the surface area as is reasonably necessary for its drilling and production operations." The rule has more recently been interpreted to mean that a mineral lessee has an implied easement by necessity to engage in activities required to effectuate the purpose of the lease, namely

oil and gas production. *Kysar v. Amoco Prod. Co.*, 2004–NMSC–025, ¶ 25, 135 N.M. 767, 93 P.3d 1272 ("It seems appropriate to characterize the implied right of the lessee to which *Carter Farms* refers as an implied easement by necessity."). The issue before us therefore requires an analysis of whether the right to enter Defendants' land to drill and oversee the OCD-mandated monitoring wells exists within the scope of Plaintiff's implied easements. Generally, the scope of an implied easement in a situation similar to Plaintiff's is only broad enough to carry out the activities reasonably necessary to produce oil and gas. *See id.* ¶ 24, 103 N.M. 117, 703 P.2d 894 (stating the general principle of oil and gas law "that when an oil and gas lease grants to the lessee a particular tract of land for the purpose of exploring, drilling, mining and producing oil and gas, the lessee gains by implication the right to enter upon and use as much of the surface as may be [reasonably] necessary for the lessee's operations."). Accordingly, we must determine whether the abatement and monitoring of the groundwater pollution that resulted from Plaintiff's operation are activities that are reasonably necessary to produce oil and gas.

{18} Defendants counter Plaintiff's argument that the district court "interpreted too narrowly the reasonable and necessary uses of the surface estate that are implicit in the oil and gas leases" by asserting that the implied easements created by the Cleveland Lease and the Gulf Lease do not include access rights to perform any action other than that which is necessary to effectuate the production of oil and gas. Defendants' argument follows that the identification and quantification of groundwater contamination "is not necessary to drilling and producing oil and gas." Because we fail to see the direct connection between the reasonable necessity of state-mandated pollution abatement and monitoring and the production of oil and gas, we agree with Defendants and conclude that Plaintiff's implied easements do not stretch to such a length. While Plaintiff's implied easements entitle it to perform any action reasonably necessary to extract or produce oil, gas, and minerals from Defendants' property, they do not provide Plaintiff with carte blanche to access Defendants' property to

ameliorate pollution based on a settlement agreement with OCD. Furthermore, Plaintiff's argument in favor of finding implied easements does not intimate that the groundwater pollution that triggered OCD's mandate was either inevitable or inextricably linked to its right under the leases to extract oil, gas, and minerals from Defendants' property, and we will not make such an assumption in order to find an implied right of entry in Plaintiff. We therefore conclude that Plaintiff's implied easements do not include an access right to Defendants' land in order to implement its agreement with OCD.

## EQUITABLE ACCESS FEE

{19} Finally, Plaintiff argues that the district court erred in granting Defendants' request for an equitable annual access fee from Plaintiff in exchange for its drilling and oversight of the monitoring wells. This Court has stated that "[t]he question of whether, on a particular set of facts, the district court is permitted to exercise its equitable powers is a question of law, while the issue of how the district court uses its equitable powers to provide an appropriate remedy is reviewed only for abuse of discretion." *United Props. Ltd. v. Walgreen Props., Inc.*, 2003–NMCA–140, ¶ 7, 134 N.M. 725, 82 P.3d 535. We review questions of law de novo, *Garcia v. Dorsey*, 2006–NMSC–052, ¶ 13, 140 N.M. 746, 149 P.3d 62, and will not conclude that a district court has abused its discretion unless its "ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996–NMSC–078, ¶ 65, 122 N.M. 618, 930 P.2d 153.

{20} We first address whether the district court was permitted to exercise its equitable powers in the present case. "New Mexico courts do not distinguish between actions brought at law or suits brought in equity." *Id.* ¶ 27, 122 N.M. 618, 930 P.2d 153. Accordingly, "if the allegations of a complaint disclose ... the existence of a claim for equitable relief, the [district] court can administer full relief." *Id.* ¶ 28, 122 N.M. 618, 930 P.2d 153. Because "[a]n injunction is an equitable remedy," *Cafeteria Operators, L.P. v. Coronado–Santa Fe As-*

*socs., L.P.,* 1998–NMCA–005, ¶ 19, 124 N.M. 440, 952 P.2d 435, Plaintiff's request for permanent injunctive relief in order to effectuate the settlement agreement that it entered with OCD served to invoke the district court's equity jurisdiction. *See id.* As such, the district court properly exercised its equitable powers, and our analysis shifts to whether the district court abused its discretion in granting Defendants' equitable request for an annual per well access fee.

{21} In granting Defendants' request for an equitable access fee, the district court noted the following: "Plaintiff's Petition for Permanent Injunction seeks an equitable remedy and therefore Plaintiff must be prepared to do equity in order to receive equity." In making that statement, the district court invoked the maxim that "he who seeks equity must do equity," which "has long been a part of our law." *Pino v. Sanchez,* 98 N.M. 150, 151, 646 P.2d 577, 578 (1982). District courts apply this maxim when the equitable relief granted to one party in a lawsuit results in some type of unfairness to the other party, creating the necessity of further relief in order to ensure that justice has been served. *See id.* The application of this maxim necessarily requires a district court to exercise its "broad powers" to fashion an equitable remedy that ensures that justice has been done to the fullest extent possible with respect to each of the parties to the lawsuit. *See Jones,* 2005–NMCA–124, ¶ 23, 138 N.M. 477, 122 P.3d 844; *see also Smith v. McKee,* 116 N.M. 34, 37, 859 P.2d 1061, 1064 (1993) ("A trial court may create broad equitable remedies to achieve substantial justice between the parties and bring an end to the litigation."); *Plaza Nat'l Bank v. Valdez,* 106 N.M. 464, 467, 745 P.2d 372, 375 (1987) ("Sitting in its equitable capacity, a court may avail itself of those broad and flexible powers which are capable of being expanded to deal with novel cases and conditions. Equity has the inherent power to supply a method in any suit to protect the rights of all interested parties.") (citation omitted).

{22} The district court granted the permanent injunction that Plaintiff requested in order to allow it to drill and subsequently oversee the OCD-mandated monitoring wells on Defendants' property. The permanent injunction created an infringement upon the property rights of Defendants. In an attempt to properly balance the equities in this case, the district court granted Defendants' request to be awarded an equitable annual access fee of $500 per well, which is the same amount that the State of New Mexico receives for monitoring wells drilled on state land. For us to hold that the district court abused its discretion, we would need to conclude that the district court's access fee remedy was "clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *See Sims,* 1996–NMSC–078, ¶ 65, 122 N.M. 618, 930 P.2d 153. We cannot reach such a conclusion given the broad discretion of the district court in fashioning equitable relief. Because it was Plaintiff that initially requested equitable relief, it was necessary for Plaintiff to "do" some sort of equity in order to receive the equitable benefit of the permanent injunction. We conclude that the district court's award of the access fee created a reasonable equitable resolution to the set of circumstances with which it was faced.

{23} We finally address Plaintiff's contention that there was not substantial evidence to support the amount of "damages" awarded to Defendants. In making that argument, Plaintiff asserts that the propriety of the amount of the access fee that the district court decided upon must be reviewed on appeal under the substantial evidence standard of review. *See Yates Petroleum Corp. v. Kennedy,* 108 N.M. 564, 565, 775 P.2d 1281, 1282 (1989) (noting that an award of damages in a bench trial must be supported by substantial evidence). Generally, damages must be proven with reasonable certainty, and surmise, conjecture, or speculation will not support an award. *See, e.g., Gulf Ref. Co. v. Etcheverry,* 85 N.M. 266, 267, 511 P.2d 752, 753 (Ct.App.1973).

{24} Relying on that line of reasoning, Plaintiff argues that because the district court's award of the annual $500 per well access fee is not based on any actual damages suffered by Defendants, it is too speculative and therefore improper. However, the access fee awarded in this case is an equitable remedy, not a legal remedy. According-

ly, the proper lens through which to view the district court's award is the abuse of discretion standard. *See United Props. Ltd.,* 2003–NMCA–140, ¶ 7, 134 N.M. 725, 82 P.3d 535. The application of the abuse of discretion standard, as discussed above, does not lead to a result requiring a reversal in this case.

## CONCLUSION

{25} For the reasons set forth above, we affirm.

{26} **IT IS SO ORDERED.**

WE CONCUR: RODERICK T. KENNEDY and MICHAEL E. VIGIL, Judges.